Roberto VELA, Maria Antonietta V. De Vela, Luis Vela, El Clareno Properties, Ltd., Blanca and Frank Barberio, Ltd., El Ebanito Minerals, Ltd., Los Angeles, Ltd., Barberio Limited Partnership, Siete Velas Partnership, Rancho Las Margaritas, Ltd., Rancho Loma Blanca, L.L.C., Antonio Vela, Jr., Cordelia Oldham, Grizelda King, Rose Benevento, Individually and as Executor of the Estate of Herminia Vela, Richard M. Barrera, Jr., Cecilia V. France, Carlos D. Barrera, Jr., Manual Cavazos IV, Luis Cavazos, and Eduardo Cavazos,[1] Appellants/Cross–Appellees,

v.

**WAGNER & BROWN, LTD.,** Appellee/Cross–Appellant.

No. 04–04–00745–CV.

Court of Appeals of Texas, San Antonio.

June 21, 2006.

---

1. Richard M. Barrera, Jr., Cecilia V. France, Carlos D. Barrera, Jr., Manual Cavazos IV, Luis Cavazos, and Eduardo Cavazos intervened in the lawsuit.

J. Bruce Bennett, Jeffery L. Hart, Cardwell, Hart & Bennett, L.L.P., Austin, Baldemar Garcia, Jr., Person, Whitworth, Borchers & Morales, L.L.P., Francisco J. Saldana, Jr., Robert A. Saldana, Law Offices of Francisco J. Saldana, Laredo, for appellant.

J. Gregory Copeland, Amy Champagne, Baker Botts, L.L.P., Jonathan B. Smith, Amy Douthitt Maddux, Kathrine M. Silver, Michael P. Lennon, Timothy E. Gehl, Macey Reasoner Stokes, Houston, Jon D. Brooks, Brooks L.L.P., Jorge C. Rangel, The Rangel Law Firm, P.C., Corpus Christi, Shirley Hale Mathis, Law Office of Shirley Hale Mathis, P.C., Laredo, for appellees.

Sitting: SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION ON APPELLANTS'/CROSS–APPELLEES' MOTION FOR REHEARING

PHYLIS J. SPEEDLIN, Justice.

The motion for rehearing filed by appellants/cross-appellees is denied. This court's opinion and judgment dated April 19, 2006, are withdrawn, and this opinion and judgment are substituted. We substitute this opinion to modify a statement concerning the record.

In this oil and gas drainage case, Roberto Vela, and the other royalty interest owners and intervenors (collectively, the "Royalty Owners"), appeal from the trial court's take-nothing judgment signed on September 20, 2004, challenging the jury's award of damages as improper and insufficient, and asserting that Wagner & Brown, Ltd., should have been sanctioned for violating the trial court's limine order establishing the methodology for calculating damages. On cross-appeal, Wagner & Brown challenges the trial court's pre-trial order assessing $75,000 in sanctions against it. We affirm the order imposing sanctions and the judgment of the trial court.

### FACTUAL & PROCEDURAL BACKGROUND

We begin by summarizing the factual and procedural background of the case. Wagner & Brown was a working interest owner [2] and the operator of three adjacent leases in the En Seguido Field in Zapata County, Texas—the Cavazos Lease, the Lopez Lease and the Vela Lease. A common gas reservoir lies under all three leases with the majority lying under the Cavazos and Lopez Leases. In June 1999, Wagner & Brown drilled the first well on the Lopez Lease, the Lopez Well No. 1, to a location less than 100 feet from the Cavazos Lease line. In November 1999, it conducted a hydraulic fracture of the Lopez Well No. 1 to stimulate its gas production and drilled a second well on the Lopez Lease. Both Lopez wells produced a high volume of gas from the common reservoir.

In March 2000, Wagner & Brown drilled the first well on the Cavazos Lease, and subsequently drilled four more wells on the Cavazos Lease; however, total production from the Cavazos wells was less than that of the Lopez wells. Wagner & Brown subsequently drilled a third well on the Lopez Lease; one well was drilled on the Vela Lease. In all, Wagner & Brown drilled a total of nine wells in the field—three on the Lopez Lease, five on the Cavazos Lease, and one on the Vela Lease. The royalty interest owners in the Cavazos Lease sued Wagner & Brown for breach of its implied duty to protect the Cavazos Lease from substantial drainage by the Lopez wells due to its failure to timely drill properly located wells on the Cavazos Lease. The lessors of the Cavazos Lease intervened in the lawsuit.

After several pretrial hearings on the proper method for calculating the damages from drainage, the trial court granted the Royalty Owners' motion in limine and ruled that damages would be calculated using a hypothetical well model to calculate "lost royalties" based on the *Amoco v. Alexander* formula,[3] and Wagner & Brown could not take any credit for future production of the real wells. Wagner & Brown had argued that a "fair share at the end of the day" or "amount drained away" formula should be used based on actual production data from the wells. In the jury charge, the court instructed the jury to use the *Amoco* formula to calculate the damages for drainage by measuring the

---

**2.** Wagner & Brown was a 50.86% working interest owner in the Lopez Lease and the Cavazos Lease, the lease in which the plaintiffs have a 25% royalty interest. Wagner & Brown sold its interest in the Lopez and Cavazos Leases to Legend Natural Gas, L.P., in August 2003.

**3.** *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex.1981); *see also Kerr–*

*McGee v. Helton*, 133 S.W.3d 245, 253 (Tex. 2004) (when breach of implied covenant to protect against drainage has been established, one measure of damages is the amount of royalties that would have been received from drilling an offset well) (citing *Tex. Pac. Coal & Oil Co. v. Barker*, 117 Tex. 418, 6 S.W.2d 1031, 1038 (1928)).

difference between the royalties that would have been paid on hypothetical wells drilled at the proper time and in the proper locations and the actual royalties paid.[4] At the conclusion of trial, the jury found in response to Question No. 1 that substantial drainage of the Cavazos Lease occurred; in response to Question No. 2 it found that Wagner & Brown failed to act as a reasonably prudent operator; and in response to Question No. 3 it found $3 million in damages from the drainage. The Royalty Owners had settled with all the other defendants prior to trial, and Wagner & Brown had made a pre-trial election of a dollar for dollar settlement credit. Because the jury's damages award of $3 million was less than the $8.9 million total settlement paid by the other defendants, the trial court entered a take-nothing judgment against the Royalty Owners upon Wagner & Brown's motion for entry of judgment on the jury's verdict. The Royalty Owners filed a motion for new trial asserting the jury had failed to follow the court's instruction for calculating damages because the only evidence to support a $3 million damages award did not arise from an *Amoco*-based calculation. The court denied the motion for new trial. Both the Royalty Owners and Wagner & Brown appealed.

### DAMAGES (DIRECT APPEAL)

We first address the Royalty Owners' issues raised on direct appeal. In their appellants' brief the Royalty Owners assert: (1) the court erred in failing to grant their motion for new trial because the jury did not use the "lost royalties" formula as instructed; (2) the court erred in refusing to instruct the jury to disregard expert testimony of the $3 million value of the 2.4 bcf "amount drained away" as a calculation of damages; (3) the court erred in permitting Wagner & Brown's expert to testify to the $3 million value of the 2.4 bcf "amount drained away" because it was not previously disclosed; (4) the court erred in refusing to send the jury back for further deliberations on damages using the *Amoco* "lost royalties" formula; (5) the jury's damages award of $3 million is against the great weight and preponderance of the evidence; (6) the award of $3 million is manifestly too small and inadequate; and (7) the court erred in refusing to sanction Wagner & Brown for violating the limine order and inducing the jury to disregard the court's damages instruction.

■ Before reaching the merits of the Royalty Owners' issues, we must first resolve the question of standing raised in footnote 2 of Wagner & Brown's cross-appellant's brief. Wagner & Brown contends that the plaintiffs lack standing to sue for drainage because they are non-participating royalty interest owners. It cites no authority in support of this claim. The Supreme Court has held that, "[a]lthough royalty is payable only as minerals are produced, a royalty owner is entitled to compensation for damage to a reservoir underlying an oil and gas lease." *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 890 (Tex.1998) (noting a royalty owner may sue for its own damages without joinder or permission of the lessee); *see also Elliff v. Texon Drilling Co.,* 146 Tex. 575,

4. The *Amoco* instruction required the jury to apply a "lost royalties" formula to calculate the damages by taking "the dollar amount of royalties that would have been paid on gas produced from wells that a reasonably prudent operator would have drilled timely and in proper locations in compliance with its duty to protect the lease from substantial drainage, minus the dollar amount of royalties that the Royalty Owners received on the gas that was actually produced from wells that would otherwise not have been drilled during the period in question."

210 S.W.2d 558, 563 (1948). The Royalty Owners clearly had standing to sue Wagner & Brown as the operator of the lease for damages based on drainage. *See* Tex. Nat. Res.Code Ann. § 85.321 (Vernon 2001) (providing that a party who owns an interest in property or production may sue for and recover damages based on a violation of chapter 85 or a valid rule or order of the Railroad Commission); *see also Amoco,* 622 S.W.2d at 572 (noting that a royalty interest is an interest in real property). Therefore, we now proceed to consider the merits of the Royalty Owners' issues on appeal.

The following is a brief summary of the relevant trial testimony on damages. The Royalty Owners' expert, Rex Howell, testified there was substantial drainage of 11 bcf[5] from the Cavazos Lease cause by Wagner & Brown's failure to operate as a reasonably prudent operator of that lease. Howell then testified to his damages model based on his prediction of production from hypothetical wells drilled on the Cavazos and Lopez Leases at proper times and locations under the *Amoco* formula for calculating lost royalties. Howell opined that based on his *Amoco*-based model, the Royalty Owners' damages for drainage were approximately $13.9 million, taking the royalties that would have been paid on the hypothetical Cavazos wells and subtracting the royalty amounts paid on the actual Cavazos wells.[6] On cross-examination, Howell stated that under his *Amoco* model, the difference in total production between the real Lopez Well Nos. 1 and 2 (total production of 31.0 bcf), and his two hypothetical Lopez Wells (total production of 28.6 bcf) was 2.4 bcf. In response to the question, "So in your hypothetical world, if Wagner & Brown had done what you say

they should have done, ... this 2.4 bcf of gas would have been back over here and produced out of the Cavazos wells?" Howell answered, "most likely." With respect to whether the 2.4 bcf difference in production between the real and hypothetical Lopez wells could be the amount of drainage from the Cavazos Lease, Howell replied that he did not disagree and it was possible, but he would have to think about it more before he could agree. Howell also admitted on cross-examination that his flow rate for the hypothetical Cavazos wells was overstated by 15% based on the wells' real production.

Wagner & Brown's expert, Rick Garza, testified that the Royalty Owners actually suffered no substantial drainage because the real Cavazos lease line wells had been producing more gas than the real Lopez lease line wells for the last two years. Garza stated that Howell's own damages model showed that none of the gas under the Cavazos Lease had been "lost" and there had been no substantial drainage, and therefore, no damages. Garza did not prepare his own damages model, but testified to his criticisms of Howell's model which were previously disclosed in Garza's expert report. Garza disagreed with several variables and assumptions used by Howell, such as the drilling time schedule and locations, and the flow and production rates for the hypothetical wells. Over the same type of non-disclosure objection raised below, Garza was permitted to quantify the impact of Howell's 15% overstatement in flow rates as a reduction in damages under Howell's model from $13.9 million to $9.4 million. In addition, Garza prepared a graph using Howell's model in which he presented the monthly produc-

---

5. The parties' briefs refer to volume measurements of natural gas in terms of "bcf" (billion cubic feet) and "mcf" (million cubic feet).

6. Both sides' experts based their damages calculations on an agreed price per unit.

tion of the hypothetical Lopez wells on a red line and the monthly production of the real Lopez wells on a blue line for the relevant time period of October 1999 through August 2003.[7] Garza testified the graph showed that under Howell's model, there was virtually no difference between hypothetical and real production until April 2001, and the maximum difference in production was 2.4 bcf in August 2003. Garza stated, with no objection, that 2.4 bcf was "the maximum that could have been drained off of the Cavazos lease and onto the Lopez lease in Mr. Howell's own model." Over objection, Garza then testified that the 2.4 bcf is worth "$3 million net to the Royalty Owners." During cross-examination, the Royalty Owners' attorney voir dired Garza on how he calculated the $3 million value, but no further testimony concerning the $3 million was admitted before the jury. On voir dire, Garza stated the $3 million was derived from Howell's tables, multiplying the month-by-month production by the prices Howell used, multiplying that by Howell's adjustment for btu percentage per cubic foot, multiplying that by the same royalty ratio used by Howell, and taking the difference between the hypothetical and real Lopez wells.

Finally, on rebuttal, Howell testified that Wagner & Brown caused substantial drainage from the Cavazos Lease "by pro-ducing the Lopez One too close and after it frac'd [fractured] and then drilling the Lopez Number Two and not offsetting either well." He revised his drainage calculation to 9 bcf based on another expert's revised hydrocarbon pore volume (HCPV) map that showed less gas in place under the Cavazos Lease, but testified that 9 bcf was still substantial drainage. Howell stated his damage calculation of $13.9 million had not changed because the revised map shifted the reservoir contours as well as the bottom hole location of the Lopez Well No. 1. Howell also stated it would not be "fair" to attribute the numbers that Garza had presented in his chart as "any type of fair or proper damages calculation in this case," stating that Garza had used his [Howell's] numbers "in a way that I don't think is meaningful."[8]

### Motion for New Trial.

In Issue No. 1, the Royalty Owners argue the court erred in failing to grant a new trial because it is clear the jury did not follow the *Amoco* "lost royalties" instruction on how to calculate the damages.[9] Wagner & Brown responds that we must presume the jury followed the court's instructions absent evidence of juror misconduct. We review a trial court's ruling on a motion for new trial based on jury misconduct for abuse of discretion, and only reverse if the record

---

7. Exhibit 554 was admitted with no objection other than whether Howell's numbers were correctly entered on the graph.

8. Wagner & Brown offered Exhibits # 600 and 601, which were "calculations discussed by Howell" on rebuttal; the Royalty Owners' attorney stated "no objection" as long as they were admitted only for the limited purpose of showing substantial drainage or not, but objected to their use as any type of damages calculation. The court sustained the objection to their admission as a damages calculation, and Wagner & Brown then withdrew the offer of the exhibits.

9. In Issue No. 4, the Royalty Owners assert the trial court erred in refusing to send the jury back for further deliberations on the damages question based on their apparent failure to follow the court's *Amoco* instruction. Because this record does not demonstrate that there was a conflict within the verdict, or that the jury did not unanimously answer all the issues, the court did not err in refusing to order the jury to retire for further deliberations on the damages issue. *See Gonzalez v. Gutierrez*, 694 S.W.2d 384, 390–91 (Tex.App.-San Antonio 1985, no writ).

48

shows a clear abuse of discretion. *In the Matter of J.F., Jr.*, 948 S.W.2d 807, 810 (Tex.App.-San Antonio 1997, no writ).

 Unless the record clearly demonstrates otherwise, we must presume the jury followed the court's instructions on damages. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex.2003); *see also In the Matter of J.F., Jr.*, 948 S.W.2d at 809 (applying presumption that jury followed instructions absent evidence of jury misconduct, *i.e.*, an outside influence that affected the verdict). The Royalty Owners point to the jury's notation of "2.4 MCF" on the bottom of their $3 million answer to Question No. 3 as "conclusive" proof rebutting the presumption that the jury followed the court's instructions on damages.[10] A jury's marginal notations made in connection with its verdict generally may not be considered on appeal. *First National Bank in Dallas v. Zimmerman*, 442 S.W.2d 674, 678 (Tex.1969) (declining to consider jury's handwritten notation on charge explaining the reason for its answer to a special issue); *Thomas v. Oldham*, 895 S.W.2d 352, 360 (Tex.1995) (declining to consider jury's handwritten notations as separate damage awards in response to broad form question on damages). The Supreme Court stated in *Zimmerman* that the jury's "handwritten notation was not the jury's verdict; it merely reflected the jury's mental process in arriving at their verdict ... [t]he jury's reasons for reaching a particular verdict are irrelevant, at least in the absence of some overt act of misconduct." *Zimmerman*, 442 S.W.2d at 678; *see also Mills v. Jackson*, 711 S.W.2d 427, 429 (Tex.App.-Fort Worth 1986, no writ) (holding that handwritten notations in the margin of the jury

charge do not constitute conclusive proof as to how the jury arrived at its total damages answer, even though notations added up to equal the total damages).

Even if an inference can be drawn that the handwritten notation of "2.4 MCF" explains the basis for the jury's damage award, it would be speculation for this court to assume that the notation represents the jury's actual answer or the reasoning behind it. Indeed, even though the Royalty Owners assert it is clear the jury meant 2.4 "bcf" because that was the gas quantity Garza tied to the $3 million figure, the parties' briefs and the record also contain many references to gas quantities measured in "mcf." At most, the handwritten notation represents the "mental process" by which the jury reached its verdict, and the mental process by which the jury determined the amount of the verdict is ordinarily not cognizable by an appellate court. *Mills*, 711 S.W.2d at 430 (citing *Johnston Testers v. Rangel*, 435 S.W.2d 927, 933 (Tex.Civ.App.-San Antonio 1968, writ ref'd n.r.e.)). The jury's reasons for reaching a particular verdict, as noted by the jury in a handwritten footnote notation to their verdict, are irrelevant, at least in the absence of some overt act of jury misconduct, of which there is no evidence in this case. *Zimmerman*, 442 S.W.2d at 678. The Royalty Owners' first issue is overruled.

The real question is whether the jury's $3 million damages award had a rational basis and fell within the range of evidence presented at trial. *See Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 108 (Tex.App.-Houston [14th Dist.] 1996, writ denied) (while it may not be clear how jury arrived at its damages

10. They also argue that the only evidence of damages under the *Amoco* "lost royalties" model was either $13.9 million or the adjusted $9.4 million figure, and that Garza's testi-

mony of the $3 million figure was not evidence of damages and should nevertheless have been excluded. This argument is addressed under Factual Sufficiency.

award, it has discretion to award damages within range of trial evidence). To answer that question, we next address the Royalty Owners' issues challenging the factual sufficiency of the evidence to support the $3 million damages award.

***Factual Sufficiency of the Evidence To Support $3 Million Damages Award.***

In Issue Nos. 5 and 6, the Royalty Owners claim the evidence is factually insufficient to support the $3 million damages award because it is against the great weight and preponderance of the evidence and is manifestly too small in light of the testimony that the damages under Howell's model were either $13.9 million or $9.4 million, as adjusted. Wagner & Brown responds that the $3 million award falls within the range of damages evidence presented at trial, which ranged from zero damages based on Garza's testimony of no substantial drainage to $13.9 million based on Howell's unadjusted model. It asserts the jury made a credibility choice between experts and chose to believe Garza's analysis of Howell's model and his conclusion that, based on Howell's model, at most there was drainage of 2.4 bcf valued at $3 million to the Royalty Owners. Alternatively, Wagner & Brown argues the jury could have reasonably reduced the damages under Howell's model to $3 million based on several other flaws in the model pointed out by Garza and other experts.

The jury generally has broad discretion to award damages within the range of evidence presented at trial. *Gulf States Utilities, Co. v. Low*, 79 S.W.3d 561, 566 (Tex.2002); *Potter v. GMP, L.L.C.*, 141 S.W.3d 698, 703 (Tex.App.-San Antonio 2004, pet. dism'd); *see also Mayberry v. Texas Department of Agriculture*, 948 S.W.2d 312, 317 (Tex.App.-Austin 1997, writ denied) (jury has discretion to award damages within range of trial evidence as long as there is a rational basis for its

calculations). The jury's findings may not be set aside merely because its reasoning in arriving at the amount of damages is unclear. *Potter*, 141 S.W.3d at 703. When a precise method for determining damages is presented, however, the jury may not arbitrarily assess an amount that is not authorized or supported by the trial evidence. *National Plan Administrators, Inc. v. National Health Ins. Co.*, 150 S.W.3d 718, 740 (Tex.App.-Austin 2004, pet. granted); *Mills*, 711 S.W.2d at 431 (jury's finding may be disregarded if amount awarded "was not the result of a deliberate and conscientious conviction in the minds of the jury ..."). When the trial evidence supports a range of damages awards, "as opposed to two distinct options," an award within that range is an appropriate exercise of the jury's discretion, and the reviewing court is not permitted to speculate on how the jury actually arrived at its award. *National Plan Admin.*, 150 S.W.3d at 740; *Potter*, 141 S.W.3d at 704 (affirming damages award as within the range of evidence, and declining to speculate as to how jury calculated award even though attorney stated juror told him method used after trial).

When a party attacks the factual sufficiency of the evidence on an adverse finding on an issue on which he had the burden of proof, to obtain a reversal he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001). In reviewing the factual sufficiency of the evidence to support a finding, we consider and weigh all of the evidence and set aside the finding only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Golden Eagle*, 116 S.W.3d at 761–62. The jury is the sole judge of the credibility of the witnesses and the weight of the evidence, and this

court must not merely substitute its judgment for that of the jury's. *Id.* at 761. If the amount of damages awarded is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias, then a new trial would be required. *Id.* at 773.

■ The Royalty Owners argue the $3 million award is against the great weight and preponderance of the evidence because the jury only had two options under the *Amoco* formula—to award either $13.9 million as Howell testified, or $9.4 million as Garza testified based on the reduction for the overstated flow rate. However, that argument suggests that the jury had to accept Howell's damages calculation of $13.9 million, or at least the adjusted calculation of $9.4 million, and ignores the jury's role in judging the credibility and weight of the competing expert evidence presented by not only Howell and Garza, but the other experts. A jury is entitled to disbelieve or discount any part of an expert's testimony, even though the basis of the jury's specific calculation cannot be determined from the record. *See America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 629 (Tex.App.-San Antonio 1996, writ denied) (upholding jury's damages verdict where jury did not unquestioningly accept testimony of plaintiff's expert, but reduced the amount of damages presumably based on challenges made by defendant's expert to plaintiff's damages model); *see also Barrajas v. VIA Metropolitan Transit Authority,* 945 S.W.2d 207, 209 (Tex.App.-San Antonio 1997, no writ) (jury may disbelieve an expert witness concerning damages even though his testimony is not contradicted); *State Farm Fire & Cas. Co. v. Rodriguez,* 88 S.W.3d 313, 321 (Tex.App.-San Antonio 2002, pet. denied) (jury is free to blend the evidence and believe all, some or none of a witness' testimony).

The damages evidence presented at trial ranged from Garza's testimony that the Royalty Owners incurred no substantial drainage, and thus suffered no damages at all, to Howell's testimony that the Royalty Owners suffered $13.9 million in damages. Howell later agreed that his $13.9 million calculation was based on a 15% overstatement in the flow rate of the hypothetical wells, which Garza stated would reduce the damages calculation to $9.4 million. There was other testimony by Garza as well as other experts discussing different criticisms of Howell's model which could support further reductions in Howell's damages calculation below $9.4 million. Garza calculated 2.4 bcf of total drainage, without objection, using Howell's own model, which was specifically created to calculate damages under the *Amoco* "lost royalties" formula. Garza then testified over objection that $3 million was the net amount the Royalty Owners lost in royalties based on the 2.4 bcf quantity that was drained away from the Cavazos Lease by the Lopez wells. On voir dire, outside the jury's presence, Garza explained that his $3 million figure was calculated using Howell's numbers and the applicable royalty ratio for the Royalty Owners. Even if Garza's testimony to the $3 million value of the 2.4 bcf was excluded as the Royalty Owners argue it should have been, Garza and other experts presented additional testimony that supports the jury's reduction of the $9.4 million in damages under Howell's model. In addition to the admittedly inflated flow rate of the hypothetical wells, Garza and other experts discussed several other flaws in Howell's damages model, criticizing Howell's formula as incorrect and his calculations as based on flawed assumptions. For example, Garza challenged the location of Howell's hypothetical wells, opining that one would have

resulted in a "watered out" well, and disagreed with Howell that a reasonably prudent operator would have drilled the Cavazos wells as early as the dates used in his hypothetical well model. Another expert, Waymon Gore, expressed the same criticism about the timing of Howell's hypothetical wells. In addition, Wagner & Brown challenged the underlying geology, and gas allocation between the Lopez and Cavazos Leases, used in Howell's model through Garza's testimony as well as through cross-examination of Mike Clemenson, a petroleum geologist for the Royalty Owners.

The jury was not required to unquestioningly accept Howell's damages model, but was entitled to make credibility determinations and weigh the competing expert testimony about Howell's model and the variables and assumptions upon which it was based. *America's Favorite Chicken*, 929 S.W.2d at 629. We hold that the jury could have reasonably reached its $3 million damages award by making further reductions to the adjusted $9.4 million damages figure based on the various flaws pointed out by Garza and the other experts, even without relying on Garza's testimony of the $3 million value of 2.4 bcf. *See Howell Crude Oil*, 928 S.W.2d at 108 (affirming award of lost profits below amount testified to by plaintiff's expert, even though the specific calculation was inexplicable, because the jury could have reasonably concluded some lesser award was appropriate given the defendant's expert's testimony of the flaws in the plaintiff's expert's calculations); *America's Favorite Chicken*, 929 S.W.2d at 629 (affirming jury's damage award presumably based on challenges by defendant's expert to plaintiff's expert damage model). The $3 million award must be upheld because it falls within the range of damages evidence presented at trial, and the evidence supporting the finding is not

so weak as to make the finding clearly wrong or manifestly unjust. *America's Favorite Chicken*, 929 S.W.2d at 629.

### Admission of Garza's Expert Testimony Regarding $3 Million Value & Instruction to Disregard as Violation of Limine Order.

In Issue No. 3, the Royalty Owners assert the court erred in permitting Wagner & Brown's expert, Rick Garza, to testify to the $3 million value of the 2.4 bcf drainage amount he calculated because it constitutes a "new" damages model, or "new" criticism of Howell's damages model, that was not timely disclosed and should therefore have been excluded under Rule 193.6. Tex.R. Civ. P. 193.6. The Royalty Owners also claim in Issue No. 2 that the court erred in refusing to instruct the jury to disregard Garza's testimony concerning the $3 million value as a violation of the court's limine order setting the *Amoco* formula as the damages measure. Wagner & Brown responds that Garza's testimony concerning the 2.4 bcf drainage amount, and the $3 million value of the 2.4 bcf, was not a "new" damages model or "new" criticism subject to the disclosure requirements, but was a simple calculation based on Howell's own *Amoco* damages model and the application of undisputed pricing data to the 2.4 quantity of gas; therefore, no supplemental disclosure was required under Rule 195.6. Tex.R. Civ. P. 195.6. Further, because the testimony of $3 million was based on the 2.4 bcf calculation derived from Howell's own *Amoco* model, there was no violation of the limine order. Finally, Wagner & Brown argues that even if Garza's testimony about the $3 million value was error, it was harmless because he highlighted several other flaws in Howell's model that would have supported the jury's reduction of Howell's damages model to $3 million; therefore,

the whole case did not turn on Garza's testimony of the $3 million value.

We review the trial court's decision to admit or exclude expert evidence for an abuse of discretion. *Rodriguez,* 88 S.W.3d at 318. We reverse based on the erroneous admission or exclusion of evidence only if the appellant shows error that was calculated to cause and probably did cause the rendition of an improper judgment. Tex.R.App. P. 44.1(a); *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995); *Doncaster v. Hernaiz,* 161 S.W.3d 594, 601 (Tex.App.-San Antonio 2005, no pet.) ("error on questions of evidence is generally not reversible unless the appellant can show that the whole case turns on the particular evidence admitted or excluded"). We review whether the trial court erred in declining to strike testimony or give an instruction to disregard testimony for an abuse of discretion. *Anderson Producing, Inc. v. Koch Oil Co.,* 929 S.W.2d 416, 425 (Tex.1996).

During Garza's direct testimony, he testified to his 2.4 bcf calculation of maximum drainage based on Howell's model without objection. When counsel for Wagner & Brown asked Garza to put a dollar amount on that quantity of gas, the Royalty Owners' attorney objected that it was a violation of the limine order on calculation of damages and requested the court to instruct the jury that the "amount drained away" was not the proper measure of damages, and to give the *Amoco* instruction on damages at that time. The trial court declined, preferring to charge the jury on the measure of damages at the end of trial. When questioning resumed, the Royalty Owners again objected to the same question, arguing that it was a newly created damage model which had not been disclosed by Wagner & Brown and was thus inadmissible under Rule 193.6. Wagner & Brown responded that Garza was merely

showing there was no substantial drainage, and thus no damages, using Howell's own model, and that Howell himself had agreed on cross-examination that 2.4 bcf was the difference in production between the real and hypothetical Lopez wells under his model. The court ruled that the valuation question could be asked, but instructed Wagner & Brown's counsel "not [to] phrase it in terms that he's presenting it as a damage model." The question was then posed as, "What is that 2.4 bcf of gas worth?" Garza answered, "$3 million net to the Cavazos royalty owners that are here as plaintiffs." There was no further objection at that time. Finally, on cross-examination, counsel for the Royalty Owners took Garza on voir dire to determine how he calculated the $3 million amount and again objected that, "in a backhanded way [he] threw in a damage calculation that they have never disclosed to us." The record reflects that Garza stated he did create a spreadsheet using Howell's own data to calculate the $3 million, and a copy was given to the Royalty Owners' attorney that morning. Wagner & Brown argued the $3 million is "not a damages calculation . . . it's calculating what the difference is," and putting a dollar value on the number that came out on cross-examination of Howell. The Royalty Owners requested that the court strike the $3 million testimony and instruct the jury to disregard that testimony as any evidence from Garza on damages. The trial court stated it was "inclined to do it but, . . . the fact remains that there are underlying factors that they could consider . . . I will tell them what the formula is for calculating damages if any they find, but I just wouldn't know how to do it properly [now] . . . So I can't really instruct them to disregard a factor that's there based on the numbers even though . . . they're not supposed to get any damage calculation in that fashion without having disclosed it to you, but I don't know

how to do it before the jury." The court concluded that the issue would have to be dealt with in the jury charge.

The Royalty Owners assert the court erred because the sanction for failing to supplement a discovery response is automatic exclusion of the witness' testimony for whom the supplemental information was not provided. Tex.R. Civ. P. 193.6; *see Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 243 (Tex.App.-San Antonio 1996, writ denied) (noting there is an exception to such automatic exclusion where the trial court determines the witness' testimony should be permitted for good cause shown, which is subject to review for abuse of discretion). The general rule in Texas is that a party must make a full and complete response to proper discovery requests, and this obligation includes the duty to timely supplement discovery. Tex.R. Civ. P. 193.5. This duty to supplement applies to information concerning expert witnesses, and the trial court must exclude the testimony of an expert witness when the duty to supplement has been violated, absent a showing of good cause or no unfair surprise. Tex.R. Civ. P. 193.6, 195.6; *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex.1992). To the extent a party's retained testifying expert changes or modifies his opinion, the party must amend or supplement the expert's deposition testimony or written report with regard to his mental impressions or opinions and their basis. Tex R. Civ. P. 195.6; *Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d 299, 304 (Tex.1993) (duty to supplement requires that opposing party have sufficient information about expert's opinion to prepare cross-examination and rebuttal with own experts, and that opposing party be promptly and fully advised when past information has been rendered incorrect or misleading).

An expert may, however, modify his testimony based on refinements in his calculations and perfections in his reports through the time of trial without invoking the need to supplement. *Exxon*, 868 S.W.2d at 304; *Foust v. Estate of Walters*, 21 S.W.3d 495, 504 (Tex.App.-San Antonio 2000, pet. denied). When an expert simply applies different data of record to a previously disclosed formula to render an alternate opinion than the opposing expert, that qualifies as a mere refinement of his opinion without the need to supplement. *Koko Motel v. Mayo*, 91 S.W.3d 41, 50–51 (Tex.App.-Amarillo 2002, pet. denied) (and cases cited therein). When an expert "merely function[s] as a human calculator deriving sums from information already before the jury" it is a refinement of his testimony that does not trigger the duty to supplement. *Id.* at 51. Similarly, an expert may also modify his opinion testimony without supplementation if he is merely expanding on a subject that has already been disclosed. *Norfolk So. Ry. Co. v. Bailey*, 92 S.W.3d 577, 581 (Tex. App.-Austin 2002, no pet); *Navistar Int'l Transp. Corp. v. Crim Truck & Tractor Co.*, 883 S.W.2d 687, 691 (Tex.App.-Texarkana 1994, writ denied). The testimony of an expert should not be barred because a change in some minor detail of the person's work was not disclosed before trial. *Exxon*, 868 S.W.2d at 304.

Here, the trial court's comments show it concluded that, to the extent the $3 million testimony was a damages calculation, it should have been disclosed earlier, but because it was based on factors from Howell's own model that were already in evidence, it was admissible evidence that he could not instruct the jury to disregard. We hold the trial court did not abuse its discretion. Garza's testimony of the $3 million value was not a material change in his opinion, but merely an ex-

pansion on Howell's own *Amoco* model on which he performed a mathematical calculation and placed a dollar value using the same variables as Howell; therefore, it was admissible without the need for supplementation, and there was no abuse of discretion in refusing to instruct the jury to disregard the testimony. *See Branham v. Brown*, 925 S.W.2d 365, 370 (Tex.App.-Houston [1st Dist.] 1996, no writ) (rejecting plaintiff's challenge to admission of calculations by defendant's expert at trial because expert simply reduced previously disclosed diagram to scale and performed simple mathematical calculations of speed and acceleration that he could have done on a blackboard before the jury). Further, there was no violation of the court's limine order on the proper measure of damages because a limine order merely requires the parties to seek leave of court before inquiring into a restricted area. *Vulcan Materials Co. v. Bowers*, No. 04–04–00062–CV, 2004 WL 2997852 at *2 (Tex.App.-San Antonio Dec. 29, 2004, pet. denied). Moreover, in light of the other testimony by Garza and other experts exposing flaws in Howell's damages model, the whole case did not turn on Garza's testimony of the $3 million value of the 2.4 bcf quantity and any error in its admission was harmless. Tex.R.App. P. 44.1(a).

### Sanctions for Violation of Limine Order During Closing Argument.

Finally, in Issue No. 7, the Royalty Owners argue the court abused its discretion in failing to sanction Wagner & Brown for violating the court's limine order on the proper method of calculating damages because its attorneys argued in closing that the $3 million value of the 2.4 bcf drainage figure was the Royalty Owners' actual loss and their maximum damages, if any. Wagner & Brown responds that the Royalty Owners waived this complaint by failing to object on at least two occasions during

closing argument when Wagner & Brown's. attorneys made the same statements. Tex.R.App. P. 33.1(a). Even if the issue was preserved, Wagner & Brown asserts the closing argument was proper as a reference to or summary of the evidence admitted at trial.

A motion in limine is a procedural device that permits a party to identify, pre-trial, certain evidentiary issues the court may be asked to rule upon. *Vulcan Materials*, 2004 WL 2997852 at *2. "The purpose of such a motion is to prevent opposing parties from asking prejudicial questions and introducing prejudicial evidence in front of the jury without first seeking leave of court." *Id.; Weidner v. Sanchez*, 14 S.W.3d 353, 363 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Judges have the inherent power to regulate behavior in their courtrooms. *Dow Chemical*, 46 S.W.3d at 240. The imposition of sanctions for violation of an order in limine is left to the sound discretion of the trial court, and an appellate court will not reverse a trial court's decision on sanctions absent a clear abuse of discretion. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004); *Vulcan Materials*, 2004 WL 2997852 at *2.

During closing argument, an attorney for Wagner & Brown posed the rhetorical question, "How much drainage was there?" Counsel for the Royalty Owners objected that the drainage calculation he was referring to had been excluded. Counsel replied, "Nothing has been excluded ... I'm talking about drainage. I'm talking about Howell's own chart, his own calculation and what it shows in terms of drainage." The court overruled the objection. When counsel proceeded by saying, "... what I want to do is explain to you what these numbers mean ... You'll remember [Wagner & Brown counsel] took Mr. Howell

through his own calculations, his own damage model and he showed . . . ," counsel for the Royalty Owners again objected that it was improper because the court had ruled the [2.4 bcf] drainage calculation was not damages. Wagner & Brown's attorney argued it was based on cross-examination of Howell's own model. The court then instructed the jury that, "the lawyers can call attention to the exhibits and the demonstrative evidence that they used during the course of trial, but you are given the weight to measure damages, if any, in the Court's charge and that is what you are bound by." The Royalty Owners' attorney did not make a request for sanctions based on a violation of the limine order.

During a later stage of closing argument, another Wagner & Brown attorney urged the jury to accept Garza's calculations and criticisms of Howell's model as more credible, and encouraged them to apply their common sense to Howell's hypothetical well model while also following the court's instructions. Counsel stressed the 2.4 bcf drainage calculation based on Howell's own numbers as an "insignificant" amount of gas that was lost, and referred to $3 million as the value of that "lost" gas, without objection. When counsel got to Question No. 3 on damages, he argued for zero damages based on Garza's testimony that there was no substantial drainage, but asserted the most damages there could possibly be was $3 million based on the 2.4 bcf calculation using the plaintiffs' own model. There was no objection.

 The Royalty Owners did not make a request for sanctions in the trial court, and also failed to object in the later stages of closing argument when the same trial evidence was referred to in the context of damages; therefore, they have waived their complaint on appeal. Tex.

R.App. P. 33.1(a); *Macias v. Ramos,* 917 S.W.2d 371, 375 (Tex.App.-San Antonio 1996, no writ) (objection is required to preserve error arising from improper jury argument unless error is deemed incurable). Even if their issue was not waived, there is nothing in the record to suggest the trial court abused its discretion in failing to sanction Wagner & Brown's attorney for merely commenting on evidence that was admitted at trial. In closing argument, counsel may refer to the trial testimony and draw logical inferences from that testimony. *Russell v. Campbell,* 725 S.W.2d 739, 744 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.) (attorney may discuss reasonableness and probative effect of evidence during closing argument); *H.E. Butt Grocery Co. v. Rencare, Ltd.,* No. 04–03–00190–CV, 2004 WL 199272 at *4 (Tex.App.-San Antonio Feb. 4, 2004, pet. denied) (counsel is given great latitude in closing argument to discuss the facts and issues, including encouraging the jury to weigh, evaluate and test the evidence).

Based on the foregoing reasons, we overrule all of the Royalty Owners' issues on direct appeal and affirm the trial court's judgment.

### SANCTIONS FOR SPOLIATION AND DISCOVERY ABUSE (CROSS-APPEAL)

In its cross-appeal, Wagner & Brown challenges the trial court's pre-trial order assessing $75,000 in sanctions against it for spoliation and discovery abuse. Specifically, Wagner & Brown asserts: (1) the court abused its discretion because there is no evidence that Wagner & Brown destroyed any evidence; (2) the undisputed evidence does not meet the standard for spoliation sanctions because Wagner & Brown had no duty to produce the computer data, the data was not intentionally or negligently destroyed, and the absence of the data did not prejudice the plaintiffs;

(3) the $75,000 amount is unjust and excessive; and (4) there is no other basis in the record to support imposition of the sanctions.[11]

The Royalty Owners respond that Wagner & Brown agreed to the imposition of monetary sanctions to avoid exclusion of its expert's testimony, although it did not agree to the amount; therefore, it waived any complaint about the sanctions other than as to the amount. Even if there was no agreement on the imposition of monetary sanctions, the Royalty Owners assert there is sufficient evidence of intentional, or at least negligent, destruction of the data by an expert hired by Wagner & Brown to support a finding of spoliation; in addition, they argue the sanctions are further supported by the record and the court's finding of a pattern of discovery abuse in general, and its specific findings that Wagner & Brown failed to preserve and timely produce its experts' work product upon repeated requests by the plaintiffs. Finally, the Royalty Owners argue the $75,000 amount is supported by the evidence and is reasonably related to the egregious conduct and the resulting prejudice.

### Standard of Review.

We review a trial court's ruling on a motion for sanctions under an abuse of discretion standard. *Cire*, 134 S.W.3d at 838. "The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but 'whether the court acted without reference to any guiding rules and principles.' " *Id.* at 838–39. Therefore, we will reverse the trial court's ruling only if it was arbitrary or unreasonable. *Id.* at 839. The trial court's findings of fact made in a discovery abuse context are entitled to less deference than findings of fact entered in a non-jury case because the court may properly consider factors other than "evidence" introduced at the sanctions hearing in determining whether to assess sanctions. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 852 (Tex.1992) (orig.proceeding) (adopting as proper the approach used in *U.S. Fidelity & Guar. Co. v. Rossa*, 830 S.W.2d 668, 672 (Tex.App.-Waco 1992, writ denied)). In reviewing the imposition of sanctions, the appellate court examines the entire record, including "evidence" admitted at the hearing, arguments of counsel, the written discovery on file, and the circumstances surrounding the party's alleged discovery abuse. *Rossa*, 830 S.W.2d at 672.

### Analysis

On September 15, 2003, after several attempts to compel production of expert work product, the Royalty Owners filed a "Motion to Enforce Judicial Admissions, to Exclude Expert Testimony, and to Impose Sanctions for Spoliation of Evidence" based on Wagner & Brown's failure to produce the work product of its expert Bruce Ganer, whose petrophysical calculations were relied on by its drainage and damages expert Rick Garza. At the conclusion of the September 17, 2003 hearing on plaintiffs' motion, the trial court orally ordered Wagner & Brown to re-create Ganer's underlying computer data and calculations pursuant to the parties' agreement, and also imposed $75,000 in sanctions against Wagner & Brown. On October 21, 2003, after another hearing,

---

11. Wagner & Brown does not challenge the portion of the trial court's judgment finding liability for substantial drainage. In addition, although Wagner & Brown argued in the trial court that the proper measure of damages should be the "fair share at the end of the day" or the "amount drained away" rather than the "lost royalties," it does not challenge the measure of damages on appeal. *See Helton*, 133 S.W.3d at 249.

the court signed a written order memorializing its verbal order of September 17. The order contains lengthy findings of fact and conclusions of law concerning an ongoing pattern of discovery abuse by Wagner & Brown, including its failure to properly preserve and timely produce Ganer's data which it found constituted spoliation of evidence. The order is specifically based on findings of other discovery abuses as well as spoliation of Ganer's computer data.

1. *Waiver Based on Agreement to Some Amount of Sanctions?*

First, we must determine whether Wagner & Brown waived its complaint about the imposition of monetary sanctions because it agreed to pay some amount as sanctions. After the parties conferred at the conclusion of the September 17, 2003 sanctions hearing, the Royalty Owners' attorney told the court that while they had agreed the expert Ganer would re-create his data at Wagner & Brown's expense, there was "no agreement on the amount of costs to be imposed on the defendants for the delay and the additional expenses that we will have to suffer because of their failure to preserve and produce all of this data. . . ." When the court asked for an estimate, the Royalty Owners' attorney suggested $75,000, based on past expenses incurred in trying to obtain the discovery and $50,000 in future expenses for taking an anticipated five to eight depositions after they receive Ganer's re-created data and calculations. The attorneys for Wagner & Brown did not affirmatively state that they agreed to pay any monetary sanctions or costs, but merely argued against the $75,000 amount proposed by the Royalty Owners by suggesting amounts of $10,000 to $25,000 as "appro-

priate under the circumstances that we know to exist which is the computer was lost;" the Wagner & Brown attorneys also stated the amount was within the court's discretion.

At a subsequent October 21, 2003 hearing on the Royalty Owners' motion for additional sanctions for continued discovery abuse, the parties discussed the prior imposition of $75,000 in sanctions, Wagner & Brown's refusal to sign the proposed agreed sanctions order, Wagner & Brown's filing of a motion to reconsider sanctions that day, and its payment of the $75,000 into the court's registry rather than to the Royalty Owners' attorneys as ordered. At that hearing, the Royalty Owners' attorney argued that all parts of the proposed sanctions order were agreed to except the exact amount of monetary sanctions. An attorney for Wagner & Brown characterized the parties' out-of-court conference as including an offer by Wagner & Brown to pay the Royalty Owners "some money . . . of a nominal amount . . . something like $1,000 at that point in time to cover some of their costs . . . [ultimately] we could not agree on that monetary amount." At the conclusion of the hearing, the court signed the "Order Confirming Agreements and Imposing Sanctions for Discovery Abuse and Spoliation of Evidence" submitted by the plaintiffs, and ordered the $75,000 released from the court's registry. Finally, a hearing on Wagner & Brown's motion to reconsider the imposition of sanctions was held on November 14, 2003, during which the court declined to change its sanctions order; the court did not rule on whether the re-created Ganer data complied with the order or whether Ganer or Garza would be excluded.[12]

12. The court later excluded Ganer's testimony and excluded the portion of Rick Garza's opinion that relied on Ganer's data.

While it agreed to re-create Ganer's data and bear the expense, Wagner & Brown consistently opposed the imposition of monetary sanctions at the September 17, October 21, and November 14, 2003 hearings. The record as a whole does not support a conclusion that Wagner & Brown agreed to the imposition of monetary sanctions or waived its right to appeal the sanctions order. TEX.R. CIV. P. 215.3 (providing that a sanctions order for discovery abuse is subject to review on appeal from the final judgment). Therefore, we address the merits of Wagner & Brown's cross-appeal below.

2. *Sanctions Imposed for "Other Discovery Abuse" and Spoliation.*

 Before discovery abuse may be found based on a failure to produce relevant evidence, the moving party must establish that the non-producing party had a duty to preserve the evidence. *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex.2003). A party's duty to preserve evidence that it knows or reasonably should know is relevant to imminent or ongoing litigation arises as soon as the party has notice that it possesses or controls material evidence relevant to the litigation. *Albertson's, Inc. v. Arriaga*, No. 04–03–00697–CV, 2004 WL 2045389 at *2 (Tex. App.-San Antonio Sept. 15, 2004, no pet). A party who intentionally or negligently fails to preserve relevant information may be held accountable for the loss of such information. *Id.* (citing *Offshore Pipelines, Inc. v. Schooley*, 984 S.W.2d 654, 666 (Tex.App.-Houston [1st Dist.] 1998, no pet.)). The affected party may move for sanctions, or request a spoliation presumption or instruction depending on the circumstances. *Id.* The trial court has discretion "to fashion an appropriate remedy to restore the parties to a rough approximation of their positions if all evidence were available." *Wal–Mart Stores*, 106

S.W.3d at 721. A party is entitled to discovery of all documents, physical models, reports, compilations of data, or other material provided to, reviewed by, or prepared by or for a retained testifying expert. TEX.R. CIV. P. 192.3(e)(6), 194.2(f)(4). A party is entitled to obtain the same information about a consulting expert whose work was reviewed by a testifying expert as it can obtain from the testifying expert. TEX.R. CIV. P. 192.3(e). An expert is required to preserve his work product and the party who retained the expert may be sanctioned if the expert destroys his work product. *See Walton v. City of Midland*, 24 S.W.3d 853, 861–62 (Tex.App.-El Paso 2000, no pet.), *abrogated on other grounds*, 130 S.W.3d 144 (Tex.App.-El Paso 2003, no pet.) (affirming sanctions against party whose retained expert destroyed his work product, including computer data, when he was not paid).

 The trial court has discretion to impose sanctions for discovery abuse under Rule 215.3. TEX.R. CIV. P. 215.3. There are three legitimate purposes of discovery sanctions: (1) to secure compliance with discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish violators. *Blackmon*, 841 S.W.2d at 849; *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex.1986). Discovery sanctions must also be "just." TEX.R. CIV. P. 215.2(b); *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex.2003); *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991) (orig. proceeding) ("the punishment should fit the crime"). We apply a two-part test to determine whether non-death penalty sanctions are just: (1) a direct relationship between the offensive conduct and the sanction imposed must exist; and (2) the sanction imposed must not be excessive. *Spohn Hosp.*, 104 S.W.3d at 882; *Trans-American*, 811 S.W.2d at 917. A "just"

sanction must be directed against the abuse and toward remedying the prejudice caused to the party. *Spohn Hosp.*, 104 S.W.3d at 882. As to the second prong, the sanction should be no more severe than necessary to satisfy its legitimate purposes, and the court must first consider whether less stringent sanctions would promote full compliance and deter future abuse. *Id.; Blackmon*, 841 S.W.2d at 849. A trial court may impose sanctions based on a general pattern of discovery abuse, as well as for filing frivolous objections to discovery requests and for giving false testimony—all of which the trial court found Wagner & Brown engaged in here. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242–43 (Tex.1985) (pattern of discovery abuse); *Childs v. Argenbright*, 927 S.W.2d 647, 649 (Tex.App.-Tyler 1996, no writ) (attorney filed 14 pages of objections to discovery without any substantive responses); *Schaver v. British Am. Ins. Co.*, 795 S.W.2d 875, 877–78 (Tex.App.-Beaumont 1990, no writ) (false testimony).

 In the context of the record as a whole, the trial court's order meets both parts of the test for a "just" sanction based on both a pattern of discovery abuse by Wagner & Brown and its failure to preserve and produce Ganer's computer data. At all the relevant discovery hearings, the court took judicial notice of all prior pleadings, hearings and orders concerning discovery. We briefly summarize the relevant discovery hearings.

In an order entered after an April 4, 2003 hearing on the Royalty Owners' second and third motions to compel discovery and for sanctions, Wagner & Brown was ordered to re-construct the drilling notebooks for the Lopez Well No. 1 and two Cavazos wells, and to produce certain expert reports including Rick Garza's report, which was based on Brian Ganer's new HCPV (hydrocarbon pore volume) calcula-

tions. The matter of sanctions was expressly held in abeyance. In May 2003, the Royalty Owners were still attempting to obtain Ganer's underlying well log data and calculations to support his new HCPV values that differed from the old HCPV values used by Wagner & Brown to drill the wells on the field. On May 28, 2003, counsel for Wagner & Brown represented that he had spoken with Ganer and Garza, and both were convinced the plaintiffs had "all of the documents Bruce Ganer generated" and "for sure have everything that Rick Garza requested and relied upon." Plaintiffs' counsel submitted a follow-up request asking whether they had copies of "all studies and calculations and work papers (and any other documents defined broadly) that Mr. Ganer prepared in connection with this case?" The inquiry was not answered.

On June 13, 2003, the Royalty Owners filed a motion to exclude Garza's expert testimony on drainage and damages as unproven and unreliable. At an August 5, 2003 hearing, Garza testified that he hired Ganer to assist him because Ganer owned a software license for the necessary computer program and Ganer's role was merely "ministerial" like a typist. At an August 26, 2003 hearing, the parties entered into a Rule 11 agreement in which Wagner & Brown agreed to produce all of Ganer's work product and produce him for deposition by September 2, 2003. The deposition did not take place because the Royalty Owners were not satisfied that they had received all of Ganer's underlying data and calculations.

On September 15, 2003, plaintiffs filed their motion to exclude Ganer's opinion, and to exclude Garza's testimony to the extent he relied on Ganer's calculations, based on Wagner & Brown's failure to timely produce Ganer's calculations and "spoliation" of the underlying computer

data. At the September 17, 2003 hearing on their motion, the Royalty Owners argued that Wagner & Brown had merely re-produced old documents, which did not include Ganer's underlying data and calculations, and had recently informed them that Ganer's underlying computer data was "lost." The Royalty Owners' attorney stated that on September 2, counsel for Wagner & Brown had informed him that Ganer "did not retain any of the output provided to Mr. Garza" and "can not find the digitized well log file" because the computer he used was missing. Wagner & Brown had also just informed plaintiffs' counsel that Ganer did not in fact have the software license or own the computer he used for the calculations, but had used the software program on a computer owned by El Paso Energy Corporation, where he had been working. While Ganer was on vacation for one week in late April 2003, El Paso upgraded and replaced his computer despite his instructions that the computer was not to be removed during his absence. Despite Ganer's attempts to locate the computer, it and the data supporting his calculations were now "lost." At the conclusion of the September 17, 2003 hearing, the trial court stated that the Royalty Owners were entitled to the requested Ganer work product, and offered two options—Wagner & Brown could be ordered to reproduce Ganer's data and calculations at its expense, or could have their expert Garza excluded as a sanction. The judge made clear that he was trying to avoid excluding Wagner & Brown's expert on the then-eve of trial. The parties conferred, and agreed that Ganer's work would be re-created at Wagner & Brown's expense. As noted, there was no agreement on the amount of any monetary sanctions, and the court imposed sanctions of $75,000 consisting of the past expenses incurred by the Royalty Owners in obtaining this discovery and the anticipated future expenses to have an expert analyze Ganer's work product and to conduct additional depositions to defend against the new calculations.

At the October 21, 2003 hearing, when discussing the language of the proposed order on sanctions, the trial court expressed its frustration on the record, stating, "[u]nless the order is very specific, then there's always questions raised about, well, we didn't interpret it to mean this, or that we had to produce that, or in our way of looking at it, it doesn't apply to these documents." The court then signed the written order which contains lengthy and specific findings of fact and conclusions of law, including, but not limited to, findings that Wagner & Brown "has improperly resisted discovery of [its] experts' work product in this case and failed to properly preserve and timely produce ... the calculations and analyses relating to new HCPV values calculated by Mr. Ganer ... [despite] repeatedly requested production of all work product ... (including computer records);" engaged in "a pattern, practice, and scheme of obstruction, deception, and destruction of the requested calculations, analyses, and other computer documents of Mr. Ganer;" and "presented false testimony ... regarding the possession by Mr. Ganer of a license to run the software program ... and the nature and substance of Mr. Ganer's involvement in the calculation of such new HCPV values." The order also contained findings of general discovery abuse, stating in part that Wagner & Brown had "engaged in a pattern and practice of abusing the discovery process and of obstructing justice in this case;" "failed to comply with this Court's prior discovery orders;" "failed to provide full and timely production of documents and answers to interrogatories;" and "filed numerous repetitive and frivolous objections to legitimate discovery requests ... for no

purpose other than to delay and impose unnecessary costs on Plaintiffs and Intervenors." The court further found that "despite past discovery abuses in this litigation, the Court has not sanctioned Wagner & Brown," and had held the matter of sanctions in abeyance after the April 4, 2003 hearing. Finally, the court found that Wagner & Brown "will not cease its abuse of the discovery process without the imposition of a monetary sanction in a sufficient amount" and "such sanction is required to promote full compliance by Wagner & Brown ... of its discovery obligations." The court then ordered the payment of $75,000 "in costs and sanctions" to the Royalty Owners.

Finally, at the November 14, 2003 hearing on Wagner & Brown's motion to reconsider, the trial court characterized its imposition of the sanctions as having to do with the failure to produce "discovery of the underlying study that supported the findings or opinion of the expert," and noted that it did not understand spoliation to be the issue and did not intend to make a finding of spoliation. The court stated, "... the gravamen here was not the spoliation. It was the fact that they didn't get it timely so they could give it to their expert." While noting that the order signed by the court contains a finding of spoliation, the Royalty Owners' attorney represented to the court that, "... if the court feels it appropriate to delete any of the findings there, that is not going to change the support for the order with the discovery abuses ... that we proved up or with regard to the loss of that important information." The court declined to amend or withdraw its October 21, 2003 order.

The trial court's findings of a general pattern of discovery abuse by Wagner & Brown, and of its specific failure to preserve and produce Ganer's data, are firmly supported by the record, which includes ten hearings on the issue of the underlying calculations for Garza's opinion alone. The record supports the court's imposition of sanctions for the legitimate purposes of securing compliance with its orders to produce Ganer's work product, deterring future non-compliance with the discovery rules, and punishing the offensive conduct. *See Blackmon,* 841 S.W.2d at 849. There was a direct relationship between Wagner & Brown's offensive conduct and the monetary sanction. The court held the issue of sanctions in abeyance through several hearings on this issue, and clearly sought to impose a sanction that would punish the conduct without striking Wagner & Brown's main damages expert, Rick Garza. *See Spohn Hosp.,* 104 S.W.3d at 882. The Royalty Owners showed that without the underlying data and calculations, they were unable to adequately challenge the reliability of Ganer's data, and thus Garza's testimony based on Ganer's data, in preparation for trial. *See Wal–Mart Stores,* 106 S.W.3d at 721 (recognizing that an opponent's refusal to produce properly requested data can seriously impair a party's ability to present its claim or defense). The attorneys for Wagner & Brown agreed at the September 17, 2003 hearing that it was possible to reproduce Ganer's underlying data and calculations, within a reasonable range of differential (which was subsequently disputed by the parties) and agreed to do so to avoid exclusion of their expert.

In addition, the Royalty Owners showed they were prejudiced by the delay in disclosure and by expending funds to pursue several motions to compel production of this discoverable work product and motions for sanctions. The record shows that of the $75,000 total sanctions, $25,000 was intended to reimburse the Royalty Owners for past expenses directly related

to their costs and attorneys' fees in pursuing their motions to compel discovery of Ganer's data. The additional $50,000 in sanctions was for anticipated future expenses for additional expert analysis of Ganer's data and for five to eight depositions based on the analysis of Ganer's data once it was re-created and produced. As noted, Ganer's data was never fully re-created, his testimony was excluded, and the portions of Garza's opinion that relied on Ganer's data were excluded. At the October 21, 2003 hearing, before the court signed the order, the Royalty Owners' attorney represented that the plaintiffs' attorneys had spent 1,000 hours of attorney time on discovery issues as of September 17, 2003, and suggested the time be valued at $250 per hour. In addition, the Royalty Owners' lead attorney submitted an affidavit at the November 14, 2003 hearing, which was admitted into evidence, in support of the 1,000 hours of attorney time on discovery disputes, plus an additional $21,250 in attorneys' fees since September 17, 2003 on the discovery sanctions issue. A monetary sanction should be no more severe than necessary to satisfy its legitimate purposes, and the court must first consider whether less stringent sanctions would promote full compliance and deter future abuse. *Spohn,* 104 S.W.3d at 882; *TransAmerican,* 811 S.W.2d at 917. Based on the court's detailed findings of a general and continuing pattern of discovery abuse and the delay and expenses suffered by the Royalty Owners, which are firmly supported by the record, we hold the trial court did not abuse its discretion in assessing $75,000 in sanctions for specific and general discovery abuse.

■■■ Finally, Wagner & Brown's argument that the Royalty Owners failed to plead "any other discovery abuse" as a basis for sanctions in their September 15, 2003 motion, and that the court's sanctions order is based solely on its finding of spoliation of Ganer's data, is discredited by the order's lengthy findings of other discovery abuse, and by the record of the prior hearings held to compel disclosure of Garza's work product and the fact that sanctions were held in abeyance. In addition, the Royalty Owners' motion complains of Wagner & Brown's delays in producing the requested Ganer data, separate from the allegation of ultimate spoliation of the data. Even if there is insufficient evidence to support the court's finding of spoliation as Wagner & Brown contends, that finding may be disregarded and the order may be upheld on the basis of the many other fact findings and conclusions of law finding specific and general discovery abuse. *See City of Houston v. Cotton,* 171 S.W.3d 541, 546 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (an incorrect conclusion of law does not require reversal if the controlling findings of fact support the judgment under a correct legal theory). Therefore, we need not address the sufficiency of the evidence to support the finding of spoliation. Moreover, even in the absence of an applicable rule or statute, a trial court has the inherent power to sanction a party for bad faith abuse of the judicial process. *In re Bennett,* 960 S.W.2d 35, 40 (Tex. 1997) (orig. proceeding); *Howell v. Tex. Workers' Comp. Com'n,* 143 S.W.3d 416, 446–47 (Tex.App.-Austin 2004, pet. denied).

Based on the foregoing reasons, we overrule all of the Royalty Owners' issues raised on direct appeal and all of Wagner & Brown's issues raised on cross-appeal. Accordingly, we affirm the trial court's order imposing sanctions and the judgment of the trial court.