



## OPINION

No. 04-10-00272-CV

**LASALLE PIPELINE, LP**,
Appellant

v.

**DONNELL LANDS, L.P.**,
Appellee

From the 36th Judicial District Court, McMullen County, Texas
Trial Court No. M-09-0005-ED-A
Honorable Joel Ballard Johnson, Judge Presiding

Opinion by:　Karen Angelini, Justice

Sitting:　　Karen Angelini, Justice
　　　　　　Sandee Bryan Marion, Justice
　　　　　　Phylis J. Speedlin, Justice

Delivered and Filed:　December 15, 2010

MODIFIED, AFFIRMED AS MODIFIED

This is an appeal from a judgment awarding damages in a condemnation case. The appellant, LaSalle Pipeline LP, filed an eminent domain action to acquire temporary workspace easements and permanent right-of-way easements on two tracts of land in McMullen County, Texas. The tracts are owned by Donnell Lands L.P., a family limited partnership and the appellee in this case. Special commissioners assessed damages against LaSalle in the amount of $226,055.00, and LaSalle deposited this amount into the registry of the court. Donnell Lands

objected to the commissioners' damage award. As a result, the issue of damages was tried to a jury.

The jury found Donnell Lands was entitled to damages in the total amount of $658,689.00. This amount included $19,206.00 for the temporary workspace easements, $34,533.00 for the permanent easements, and $604,950.00 for the diminution in value to the remainder of the tracts. The trial court denied LaSalle's motion to disregard the jury's findings and for judgment notwithstanding the verdict, and rendered judgment on the verdict. Because Donnell Lands had withdrawn the commissioner's award from the registry of the court, the judgment credited the total damage award in the amount of $226,055.00, and ordered LaSalle to pay Donnell Lands the balance of $432,634.00. LaSalle appealed the judgment.

LaSalle's main complaint on appeal is that the damages awarded are not supported by legally or factually sufficient evidence. Specifically, LaSalle complains of the $19,206.00 awarded for the temporary workspace easements, and the $604,950.00 awarded for the diminution in value to the remainder. LaSalle does not complain about the $34,533.00 awarded for the permanent easements. LaSalle also argues the trial court erred in overruling its challenges for cause as to two venire members.

We conclude the evidence is legally and factually sufficient to support some, but not all, of the jury's damage award for the temporary workspace easements. We conclude the evidence is legally and factually sufficient to support the jury's damage award for the diminution in value to the remainder. We also conclude the trial court did not err in overruling LaSalle's challenges for cause. Accordingly, we modify the judgment to reduce the damages awarded for the temporary workspace easements, and affirm the judgment as modified.

**THE TRIAL EVIDENCE**

The trial evidence showed the pipeline at issue in this case is a natural gas pipeline. The pipeline is about sixteen inches in diameter and spans about 52 miles in all. Most, but not all, of the pipeline is underground. By the time of trial, the pipeline had already been installed. The pipeline crosses two tracts of land owned by Donnell Lands. The first tract is comprised of approximately 8,034 acres. As to the first tract, LaSalle acquired 15.95 acres of permanent easement, which extends about 4.4 miles. The second tract is comprised of about 46 acres. As to the second tract, LaSalle acquired .97 acres of permanent easement, which extends about 1,400 feet. Both tracts are used for recreation and agriculture.

Each party called two witnesses at trial. Donnell Lands called Philip McCormick, a real estate appraiser; and James Donnell Jr. LaSalle called Mike Freeman, the employee responsible for acquiring pipeline easements; and David Bethel, a real estate appraiser. Both parties offered exhibits, including documents and photographs, which were admitted into evidence.

McCormick testified he held an M.A.I. designation from the Appraisal Institute, which is the highest designation that can be achieved in the appraisal business. McCormick testified he had previously done appraisal work in McMullen County and other rural counties in Texas, and specialized in appraising farm and ranch land. McCormick described the appraisal business as "interpretive," "an art more than a science." McCormick explained that "the market itself is not [] black and white—it's not accounting." He then stated, the appraisal business "has to do with interpreting what buyers and sellers are doing in the market place."

McCormick testified that he estimated the damages to the remainder of the two tracts owned by Donnell Lands. McCormick testified that, in his opinion, the existence of the pipeline and the permanent easements diminished the market value of the tracts. He based this opinion on

comparable sales data from McMullen and Webb Counties. McCormick first looked at three comparable sales in McMullen County. The first sale was 2,283.9 acres at $1,900 per acre; the second sale was 4,742.67 acres at $1,700 per acre; the third sale was 3,102 acres at $1,525 an acre. All of the sales had occurred in the three years before the pipeline in this case was installed. Sale number one had no pipelines on it; sale number two had three pipelines on it; sale number three had two pipelines on it.

In addition, McCormick testified he looked at two comparable sales in the adjoining county, Webb County. The first sale was 3,310 acres at $1,738 per acre and had no pipeline. The second sale was 4,655 acres at $1,375 per acre and had a pipeline. McCormick stated he spoke with Larry Martin, who was involved in both of the Webb County sales. According to McCormick, Martin told him that he sold the 3,310 acre tract for considerably more money because it did not have any pipeline easements on it; and that he paid less for the 4,655 acre tract because it had a major pipeline going through the middle of it. McCormick also testified that the land in Webb County had a lot of similarities to the land in McMullen County. Specifically, McCormick noted the Webb County land, like the McMullen County land, was native pasture land with similar brush and other similar characteristics. McCormick also noted the Webb County land, like the McMullen County land, was used for recreational and agricultural purposes. The Webb County sales also had occurred within an appropriate time range, less than two years before the pipeline was installed in this case. McCormick then stated the comparable sales data reflected "a 20 percent diminution in value" "at least part of which in my opinion was attributable to the pipeline."

LaSalle did not file a written motion to exclude McCormick's testimony on the basis that it was unreliable; nor did LaSalle request a hearing outside the jury's presence to test the

reliability of McCormick's testimony. Instead, LaSalle objected repeatedly to McCormick's expert testimony in front of the jury. Before McCormick gave his opinion about the damages to the remainder of the tracts in this case, LaSalle's counsel objected as follows: "[he] [s]till lacks foundation to render opinion on damages to the remainder based on the analysis he's done." The trial court then ruled, "Sustained as to Tracts 1, 2 and, 3 [McMullen County sales]; overruled as to the Martin tracts [Webb County sales]."[1] Despite LaSalle's objections to the foundation of McCormick's expert testimony, the trial court allowed McCormick to testify about the diminution in value to the remainder of the tracts.

In estimating the diminution in value to the remainder of the tracts, McCormick testified he felt the only part of tract one that was affected by the pipeline was the north and northeastern 4,100 acres of the 8,034 acre tract, the "pastures through which this major pipeline easement is going." He stated, "I'm damaging that value 10 percent. And then on the small tract, which is the 46 acre tract…I'm damaging that 25 percent because of the very nature of it, it's a much smaller tract." According to McCormick, Donnell Lands was entitled to total compensation in the amount of $902,255.00, which included damages for the temporary and permanent easements and the diminution in value to the remainder. McCormick also prepared a written summary of the steps he took in preparing his damages estimate for Donnell Lands. This summary, which was admitted into evidence, showed that that McCormick estimated the damage to the remainder of tract one to be $820,000.00, and the damage to the remainder of tract two to be $23,490.00.

---

[1]The parties dispute the effect of this ruling. According to LaSalle, the McMullen County comparable sales were not before the jury, and must be excluded from a sufficiency review. However, according to Donnell Lands, McCormick testified at length about these comparable sales in front of the jury, and the trial court was never asked to instruct the jury to disregard this testimony. Moreover, written summaries of the McMullen County comparable sales data were later offered by LaSalle and admitted into evidence. We agree with Donnell Lands that the McMullen County comparable sales data was before the jury and should be included in a sufficiency review.

McCormick offered no testimony about the fair rental value of the temporary workspace easements.

Next, James Donnell testified that the tracts in question were worth $2,500.00 per acre before the pipeline was installed. Donnell went on to explain the ways in which the land was damaged by the pipeline and the permanent easements, including, that the pipeline cut right through the middle of the land; that LaSalle had the right to ingress and egress whenever it wanted; that LaSalle could pretty much do what it wanted with the land; that the easements could be assigned in the future to anybody; and that the easements would be a "black mark" on the deed that would be there for eternity. Donnell further testified he was familiar with what a willing buyer would consider when buying property such as his in McMullen County, and that a willing buyer would consider the factors he had previously listed. Donnell also testified that he had hired McCormick to do an appraisal and he had heard his opinion of the value of the land. Donnell then stated he supported, accepted, and agreed with McCormick's opinion of the value of the land. When asked to tell the jury if the pipeline had damaged his property in a monetary way, Donnell testified, "I think it's been damaged somewhere around $900,000.00." Donnell offered no testimony about the fair rental value of the temporary workspace easements.

LaSalle then called its expert witness, Bethel. Bethel stated that he was a certified general real estate appraiser, who obtained his M.A.I. designation through the Appraisal Institute. Bethel indicated that he had appraised different types of property, including commercial, industrial, land, and residential.

Bethel opined that the existence of the pipeline did not diminish the market value of the remainder of the tracts in this case. His opinion was based on an analysis of approximately fifteen sales in McMullen County, including some of the same comparable sales used by

McCormick. Bethel testified that he spoke to either a buyer or a seller in all of the McMullen County sales, and they all told him the existence or absence of a pipeline had no bearing on the sales price. Bethel testified that he also spoke to Martin, who was involved in the Webb County sales used by McCormick. However, according to Bethel, Martin indicated to him that the existence or absence of a pipeline had no effect on the sales price of either property. Bethel prepared written appraisals for the tracts in this case, which were admitted into evidence. In these written appraisals, Bethel relied on comparable sales in McMullen County.

Like McCormick, Bethel testified that the accepted appraisal methodology to value the tracts in this case was the sales comparison approach. According to Bethel, many factors go into determining whether a property was comparable to another: size, highest and best use, newer sales, and road frontage. In Bethel's opinion, the existence of the pipeline did not decrease the value of the remainder of either tract in this case. According to Bethel, before LaSalle acquired the permanent easement on tract one, the market value of the remainder was $18,043,486.00, or $2,250.00 per acre; after LaSalle acquired the permanent easement on tract one, the market value of the remainder was the same. Bethel further testified that before LaSalle acquired the permanent easement on tract two, the market value of the remainder was $658,230.00, or $2,500.00 per acre; after LaSalle acquired the permanent easement on tract two, the market value of the remainder was the same. Thus, according to Bethel, Donnell Lands was owed no compensation for damages to the remainder.

Finally, Bethel testified that the fair rental value of the temporary workspace easements was $5,984.00 for tract one, and $418.00 for tract two. Thus, according to Bethel, the total fair rental value owed to Donnell Lands for the temporary workspace easements was $6,402.00.

## STANDARD OF REVIEW

In conducting a legal sufficiency review, we view the evidence in the light most favorable to the party for whom the verdict was rendered. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We look to whether the evidence presented at trial enables a reasonable and fair minded jury to render the same verdict. *Id*. at 827. We must "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id*. A legal sufficiency issue will be sustained if the record shows: "(a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact." *Id.* at 810 (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362-63 (1960)). If any probative evidence supports the jury's findings, we must uphold the jury's verdict. *Exxon Corp. v. Garza*, 981 S.W.2d 415, 420 (Tex. App.—San Antonio 1998, pet. denied).

In conducting a factual sufficiency review, we consider all the evidence in the record and determine "if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We are mindful that the jury, as the fact finder, is the sole judge of the credibility of the witnesses, the weight to be given to their testimony, and the weight to be given to the evidence. *City of Keller*, 168 S.W.3d at 819. It is also within the jury's discretion to resolve inconsistencies and conflicts in the evidence, and we must accept the jury's resolution of these inconsistencies and conflicts even if it may differ from our own. *See Barrajas v. VIA Metro. Transit Auth.*, 945 S.W.2d 207, 209 (Tex. App.—San Antonio 1997, no writ). We may

not substitute our conclusions for those of the jury. If there is sufficient, competent evidence of probative force to support the jury's finding, we must uphold the jury's verdict.

FAIR RENTAL VALUE OF THE TEMPORARY WORKSPACE EASEMENTS

In its first issue, La Salle urges this court to reverse and render judgment for $5,984.00 as the fair rental value of the temporary workspace easements, which gave LaSalle the right to temporarily use part of the land for the purpose of constructing the pipeline. LaSalle argues that the jury's award of $19,206.00 for the temporary workspace easements is not supported by the evidence, and that the only competent evidence of fair market value attributable to the temporary workspace easements was $5,984.00. Donnell Lands counters that the testimony of McCormick and Donnell amply supports the jury's finding, and cites us to parts of the record that purportedly illustrate this point. Alternatively, Donnell Lands argues that even if the testimony of McCormick and Donnell does not support the jury's finding, the testimony of LaSalle's expert, Bethel, supports the finding. Bethel testified that the fair rental value of the temporary workspace easements was $5,984.00 for the larger tract and $418.00 for the smaller tract. Thus, Donnell Lands argues the evidence, at a minimum, supports a finding of $6,402.00.

The ordinary method of calculating damages for a temporary workspace easement is the fair rental value of the property. *Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 444 (Tex. App.—Texarkana 2006, no pet.); *Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture*, 50 S.W.3d 531, 545 (Tex. App.—El Paso 2001, no pet.). When a party does not object to or challenge the measure of damages the jury was instructed to use, legal sufficiency review of the damages awarded is measured by the question and the instruction given. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000).

Here, the jury was instructed that it was to calculate the temporary workspace easement damages by determining the fair rental value of the area within the temporary workspace easements. Donnell Lands made no objection to this measure of damage instruction. However, neither McCormick, nor Donnell testified to the fair rental value of the property. Instead, McCormick testified about the inconvenience caused by the temporary workspace easements and the surface damage caused by the construction of the pipeline. In fact, during cross-examination McCormick acknowledged that he did not consider fair rental value in estimating temporary workspace easement damages. Donnell also testified about how the construction and the temporary workspace easements interfered with the cattle on the land. Thus, the only evidence of the rental value of the property was provided by Bethel, who testified that the fair rental value of the temporary workspace easements for both tracts was $6,402.00. Viewing the evidence in the light most favorable to the jury's verdict, the evidence is legally insufficient to support the jury's finding of temporary workspace easement damages in the amount of $19,206.00.

Donnell Lands cites *A.G.E., Inc. v. Buford*, 105 S.W.3d 667, 677 (Tex. App.—Austin 2003, pet. denied), for the proposition that Donnell's testimony supports the temporary workspace damage award. However, *A.G.E.* is distinguishable from the present case because there the landowner actually provided some testimony about the fair rental value of the land. *Id*. at 676. Here, although McCormick and Donnell provided some testimony about temporary workspace easement damages, they provided no evidence of the fair rental value of the property. The only witness to testify about the fair rental value of the property was Bethel. Thus, the evidence is only sufficient to support a finding of temporary workspace easement damages in the amount of $6,402.00.

## DIMINUTION IN VALUE TO THE REMAINDER

LaSalle argues the evidence is legally and factually insufficient to support the jury's finding of $604,950.00 in damages for the diminution in value to the remainder of the tracts subject to the permanent easements. LaSalle asserts there is no evidence to support the jury's finding because neither Donnell's testimony nor McCormick's testimony provided evidence of the market value of the remainder. In response, Donnell Lands argues that McCormick's and Donnell's testimony, as well as the other documents admitted into evidence, provided some evidence of the diminution in value to the remainder.

When, as here, a condemnor takes only a portion of a landowner's property, the landowner is entitled to compensation in the amount of the market value of the part taken, plus the damage to the remainder caused by the condemnation. *City of Emory v. Lusk*, 278 S.W.3d 77, 87 (Tex. App.—Tyler 2009, no pet.) (citing *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 627 (Tex. 2002)). The measure of damages to the remainder is the difference in market value of the land immediately before and immediately after the taking. *Callejo v. Brazos Elec. Power Coop., Inc.*, 755 S.W.2d 73, 76 (Tex. 1988); *see also State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 172 (Tex. 2009). This rule is typically referred to as the "before and after" measure of damages. *Zwahr*, 88 S.W.3d at 627.

Market value is the price property will bring for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). There are several approaches to determining market value; however, courts have long favored the comparable sales approach when determining the market value of real property. *Id.* Under the comparable sales approach, the appraiser finds data for sales of similar property, then makes upward or

downward adjustments to these sales based on differences in the subject property. *Id*. Comparable sales must be voluntary, and should take place at or near in time to the condemnation, occur in the vicinity of the condemned property, and involve land with similar characteristics. *Id*. "Comparable sales need not be in the immediate vicinity of the subject land, so long as they meet the test of similarity." *Id*. "But if the comparison is so attenuated that the appraiser and the fact-finder cannot make valid adjustments for these differences, a court should refuse to admit the sale as comparable." *Id*. at 182-83.

Rule 702 of the Texas Rules of Evidence permits a witness qualified as an expert by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the trier of fact in understanding the evidence or determining a fact in issue. TEX. R. EVID. 702. Expert testimony must be based on a reliable foundation. *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002). In determining reliability, courts evaluate the methods, analysis, and principles relied on by the expert in reaching the opinion and ensure that the opinion comports with applicable professional standards and has a reliable basis in the knowledge and experience of the discipline. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 725-26 (Tex. 1998). Thus, the reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions. *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 254 (Tex. 2004). Expert testimony is unreliable if there is "too great an analytical gap between the data and the opinion proffered." *Gammill*, 972 S.W.2d at 726. Additionally, expert testimony is unreliable if it is no more than subjective belief or unsupported speculation. *Kerr-McGee*, 133 S.W.3d at 254. Opinion testimony that is conclusory or speculative is not relevant evidence because it does not tend to make the existence of a material fact more probable or less probable. *Gen. Motors Corp. v.*

*Iracheta*, 161 S.W.3d 462, 470-71 (Tex. 2005). Such evidence is incompetent and will not support a judgment. *Id*. at 471.

All expert testimony, including the expert testimony of appraisal witnesses in condemnation actions, must be reliable under Rule 702. *Kraft*, 77 S.W.3d at 807. Appraisal expertise is a form of specialized knowledge used to assist the trier of fact to determine a fact in issue. *Id*. Thus, appraisal expertise is subject to *Gammill*'s reliability requirements. *Id*. However, the criteria for assessing reliability varies, depending on the nature of the evidence itself. *Gammill*, 972 S.W.2d at 727. Thus, as we evaluate the reliability of McCormick's testimony in this case, we take into consideration the nature of appraisal evidence. As the Texas Supreme Court has recognized, all appraisal opinion is at best something of a speculation, and the question of market value is peculiarly one for the fact finding body. *Texas Pipe Line Co. v. Hunt*, 228 S.W.2d 151, 156 (1950).

LaSalle argues Donnell's expert testimony constituted no evidence of damage to the remainder because it was based on a flawed methodology, and therefore, was unreliable. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816-17 (Tex. 2009) ("When a scientific opinion is not conclusory but the basis offered for it is unreliable, a party who objects may complain that the evidence is legally insufficient to support the judgment."). In attacking the reliability of McCormick's testimony, LaSalle contends McCormick's methodology was flawed because he failed to first consider comparable sales in McMullen County before considering sales outside of the county. In response, Donnell Lands points out that McCormick essentially used the same methodology as LaSalle's expert, the comparable sales approach. Donnell Lands also points out that under standard appraisal methodology there is no requirement that an appraiser first consider

sales in the subject property's county before considering sales outside of the subject property's county. We agree with Donnell Lands on this issue.

First, there is nothing in the record indicating that standard appraisal methodology requires an appraiser to first consider sales within the subject property's county before considering sales outside the subject property's county. Second, the record shows McCormick used comparable sales from both McMullen County and Webb County in reaching his conclusions about the effect of a pipeline easement on market value. Finally, the case law indicates there is no requirement that comparable sales be in the same county as the subject property. *See Hays v. State*, 342 S.W.2d 167, 172 (Tex. Civ. App.—Dallas 1960, writ ref'd n.r.e.) (holding objections that comparable sales were not in the same city limits as the subject property were invalid). "Comparable sales need not be in the immediate vicinity of the subject land, so long as they meet the test of similarity." *Sharboneau*, 48 S.W.3d at 182.

LaSalle also faults McCormick for failing to talk to buyers and sellers to find out if the existence or absence of a pipeline affected market value. However, the record does not establish that standard appraisal methodology requires an appraisal expert to inquire about whether the parties to a sale subjectively believed that the existence of a pipeline easement affected the price paid. During cross-examination McCormick did agree that "one of the most critical things" an appraiser can do in determining if a pipeline affected market value is to talk to the buyers and sellers involved in a comparable sale; however, McCormick did not state that standard appraisal methodology requires an appraiser to do so. McCormick further testified that he sometimes talked to buyers and sellers to investigate their reasons for arriving at a particular price. And, although Bethel testified he talked to the buyers or sellers about the comparable sales in this case, he never stated that such discussions were required under the comparable sales

methodology.[2] Thus, the record does not establish that McCormick's underlying methodology was flawed in the manner in which LaSalle asserts. In addition, LaSalle cites no legal authority to support its contention that an appraisal expert must determine if the parties to comparable sales subjectively believed the existence or absence of a pipeline easement affected the sales price. We conclude McCormick's testimony was based on a sufficiently reliable foundation to have been considered by the jury.

Next, LaSalle attacks the reliability of McCormick's testimony because it was based on conjecture and speculation. *See Pollock*, 284 S.W.3d at 818 ("[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection."). LaSalle points to the part of McCormick's testimony where he extrapolated from the comparable sales data that the existence of a pipeline results in a 20% diminution in value to the remainder property, and faults McCormick for failing to apply this 20% diminution in value to the tracts in this case. Instead, McCormick applied a 10% diminution in value to part of the larger tract, and a 25% diminution in value to the smaller tract. As to the larger tract, McCormick opined there was only a diminution in value as to the northern 4,100 acres, which were closest in proximity to the permanent easement. McCormick's opinion was that the rest of the larger tract was not diminished in value. McCormick stated he applied a 10% diminution in value to part of the tract one remainder, but did not explain why he applied this percentage. In addition, McCormick stated he applied a 25% diminution in value to the remainder of tract two, and offered a brief

---

[2]On direct examination Bethel was asked, "When you actually do a pipeline impact study what do you actually need to do to determine if a seller is selling a property for less or a buyer is offering less just because of the pipeline, what do you have to do to try to determine that?" Bethel answered, "Well, I think you'd want to compare similar properties that have pipelines and similar properties that do not have pipelines, and so you want to know as much details about all those transactions as you can. And then it's great if you can actually call a party that was involved, either purchased or sold it, and ask them, 'Did the pipeline have an impact to the value of the property when it sold?'"

explanation for why he applied this percentage. According to McCormick, the damage to tract one's remainder was $820,000.00, and the damage to tract two's remainder was $23,490.00. Thus, McCormick concluded the damages for diminution in value to the remainder of both tracts totaled $843,490.00.

According to LaSalle, McCormick's failure to explain the percentages he applied amounted to an impermissible analytical gap between the data and his opinion. We disagree. Expert testimony is unreliable if there is "too great an analytical gap between the data and the opinion proffered." *Gammill*, 972 S.W.2d at 726. Here, however, we are not convinced there is "too great an analytical gap between the data and the opinion proffered." McCormick determined that the comparable sales data in this case showed a 20% difference between the market value of the tracts without pipelines and the market value of the tracts with pipelines. He opined that only a portion of this 20% difference was due to the existence of the pipelines. As to tract one—the 8,034 acre tract—McCormick estimated the diminution in market value was only 10%, and that only the north and northeastern 4,100 acres of the tract were in fact affected by the existence of the pipeline. And, the 10% applied by McCormick was well below the 20% decrease in value that he found to exist in the comparable sales data.

As to tract two—the 46 acre tract—McCormick estimated the diminution in market value was 25%, somewhat higher than the 20% reflected in the comparable sales data. But even though McCormick applied a 25% diminution in value to tract two, he provided some explanation, stating he was doing so "because of the very nature of it, it's a much smaller tract." Moreover, even if there was a "gap" in McCormick's estimate of the damage to the remainder of tract two, we fail to see how it was harmful in this case. McCormick's total estimate of the damage to the remainder was $843,490.00, of which only $23,490.00 was attributed to tract two. The jury's

finding of $604,905.00 in diminution in value to the remainder was substantially below McCormick's total damage estimate.

We conclude that any "gap" between the comparable sales data and the conclusions drawn from it goes to the weight of McCormick's testimony, rather than its reliability. *See Transcon. Ins. Co. v. Crump*, No. 09-0005, 2010 WL 3365339, at *7 (Tex. Aug. 27, 2010) (concluding expert's testimony was based on a sufficiently reliable foundation, and therefore, legal sufficiency challenge was denied); *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 40 (Tex. 2007) (concluding complaints about analytical gaps in expert testimony went to the weight of the evidence, not its admissibility).

Generally, the jury has broad discretion to award damages within the range of evidence presented at trial. *Gulf States Util., Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002); *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.). The jury's findings may not be set aside because its reasoning in arriving at the amount of damages is unclear. *Vela*, 203 S.W.3d at 49; *Potter v. GMP, L.L.C.*, 141 S.W.3d 698, 703 (Tex. App.—San Antonio 2004, pet. dism'd). When the trial evidence supports a range of damages awards, rather than two distinct options, an award within the range is an appropriate exercise of the jury's discretion, and the reviewing court is not permitted to speculate how the jury actually arrived at its award. *Vela*, 203 S.W.3d at 49; *Potter*, 141 S.W.3d at 704.

LaSalle urges that this case presents a situation in which the jury had only two distinct options in awarding damages—either the jury could have awarded the damages estimated by McCormick, which was $843,490.00, or it could have awarded the damages estimated by Bethel, which was zero. We disagree. The jury was entitled to set the value of the remainder at any amount between the lowest and highest values the expert witnesses put in evidence. *See Parallax*

*Corp., N.V. v. City of El Paso*, 910 S.W.2d 86, 92-93 (Tex. App.—El Paso 1995, writ denied) (holding reversal was not required when jury made damages finding below expert's damages testimony when the record included additional evidence from which the jury could determine value). The jury's finding of $604,950.00, falls within the range of the evidence presented at trial and is supported by the evidence. In addition, here the evidence included not only expert testimony, but also comparable sales data from both McMullen and Webb Counties. *See Waterways on Intercoastal, Ltd. v. State*, 283 S.W.3d 36, 46 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (concluding jury's valuation finding may be based on a variety of factors and conflicting evidence). The record before us shows there was ample evidence on which a rational jury could have based its finding.

LaSalle further argues the jury's finding of $604,950.00 indicates it made an impermissible leap outside of the evidence or impermissibly relied on its knowledge and experience instead of the evidence admitted at trial. In support of this argument, LaSalle cites *Callejo v. Brazos Elec. Power Coop., Inc.*, 755 S.W.2d 73 (Tex. 1988). In *Callejo*, the landowner's experts valued a condemned parcel at somewhere between $643,987.20 and $729,256.00 before the taking, and at zero after the taking. *Id.* at 74. The utility's experts valued the land at $67,082.00 before the taking, and at $33,541.00 after the taking. *Id.* Unlike the present case, the jury in *Callejo* made separate findings as to the land's pre-taking and post-

taking value.[3] The jury found the land's pre-taking value to be $456,161.00, and its post-taking value to be $364,928.80. *Id.* The trial court then determined that there was no evidence to support the jury's post-taking finding of $364,928.80, disregarded the finding, and substituted it with the highest post-taking value in evidence, $33,541.00. *Id*. The trial court then rendered judgment in favor of the landowner in the amount of $422,620.00, the difference between the jury's finding for pre-taking value and $33,541.00. *Id.* The court of appeals reversed the trial court's judgment; however, the supreme court reversed the judgment of the court of appeals and reinstated the trial court's judgment. *Id*. at 74-76.

In *Callejo*, the utility argued the jury could blend all the evidence—including testimony on pre-taking value—in making its finding on post-taking value. *Id*. at 75. The supreme court rejected this argument, holding that under the evidence presented, the trial court properly disregarded the jury's answer on post-taking value. *Id*. The supreme court stated, "We do agree that jurors are not bound, as a matter of law, to accept the parties' expert testimony. But, that does not authorize jurors to leap entirely outside of the evidence in answering any question submitted to them." *Id.* The supreme court further warned in *Callejo* that future condemnation cases should be submitted broadly in terms of the difference in market value of the land immediately before and immediately after the taking. *Id*. at 76. The supreme court concluded its

---

[3]The jury in this case answered the following question:

> What do you find to be the amount of damages, if any, to the remaining portion of the property outside the boundaries of the permanent easement? []

> You are instructed that the amount of the damages, if any, must be calculated by determining the difference, if any, between (a) the fair market value of the remaining 8,066 acres before May 1, 2009, considered as if LaSalle Pipeline, LP's pipeline was not on the property; and (b) the fair market value of the remaining 8066 acres after May 1, 2009, considered with LaSalle Pipeline, LP's pipeline and permanent easement on the property.

opinion by stating, "Had this case been so submitted, doubtless we would have had no appeal to review." *Id.*

*Callejo* does not mandate a reversal of the judgment in this case. First, in this case, unlike in *Callejo*, the issue of damages to the remainder was submitted broadly. Second, this is not a situation in which the record shows the jury impermissibly blended evidence of pre-taking and post-taking values. LaSalle's evidence indicated the diminution in value to the remainder was zero; Donnell Lands's evidence indicated the diminution in value to the remainder was $843,490.00. Although the jury's finding was below McCormick's estimate, there is nothing in this record showing the jury arrived at this finding by impermissibly blending evidence or leaping outside of the evidence presented at trial.

Finally, LaSalle argues it conclusively established through Bethel's testimony that there was no diminution in value to the remainder. We disagree. In making this argument, LaSalle contends the only competent evidence on diminution in value to the remainder was provided by Bethel. The jury, however, was free to disbelieve Bethel's testimony. *See Callejo*, 755 S.W.2d at 75 (recognizing in a condemnation case that jurors were not bound to accept the parties' expert opinions on value). In addition, as previously discussed, McCormick provided competent evidence of the diminution in value to the remainder.

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which the jury could not ignore, we conclude the evidence is legally sufficient to support the jury's finding that the diminution in value to the remainder was $604,950.00. Moreover, after reviewing all of the evidence, we cannot say that the evidence is so weak that the jury's finding is clearly wrong and unjust. We, therefore, conclude the evidence is

factually sufficient to support the jury's finding that that the diminution in value to the remainder was $604,950.00.

## CHALLENGES FOR CAUSE

LaSalle argues the record shows two members of the venire were biased as a matter of law, and therefore, the trial court erred in denying its challenges for cause. LaSalle properly preserved this complaint by objecting and notifying the trial court that its peremptory strikes had to be used on these venire members, and it was unable to use those peremptory strikes on two other objectionable venire members who were ultimately seated on the jury.

Fair and impartial jurors reach a verdict based on the evidence, rather than on bias or prejudice. *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 751-52 (Tex. 2006). A person is disqualified to serve as a juror in a particular case if he has a bias or prejudice in favor of or against a party in the case. TEX. GOV'T CODE ANN. 62.105(4) (West 2005). Bias or prejudice is shown when a venire member's answer to a specific question establishes that he cannot be fair and impartial because his feelings are so strong in favor of or against a party, or the subject matter of the litigation. *Sosa v. Cardenas*, 20 S.W.3d 8, 11 (Tex. App.—San Antonio 2000, no pet.). Thus, bias or prejudice is shown when the record shows a venire member will base his verdict on his feelings, rather than on the evidence. *Id*.

To disqualify a potential juror for bias or prejudice as a matter of law, the record must conclusively show that the potential juror's state of mind led to the natural inference that he could not act with impartiality. *Cortez v. HCCI-San Antonio, Inc.*, 131 S.W.3d 113, 118 (Tex. App.—San Antonio 2005), *aff'd*, 159 S.W.3d 87 (Tex. 2005). Thus, a venire member who unequivocally admits bias or prejudice is disqualified to serve as a juror as a matter of law. *Shepherd v. Ledford*, 962 S.W.2d 28, 34 (Tex. 1998); *Sullemon v. U.S. Fid. & Guar. Co.*, 734

S.W.2d 10, 14 (Tex. App.—Dallas 1987, no writ). Whether a venire member is biased or prejudiced is determined from the record as a whole. *Cortez*, 159 S.W.3d at 92-93. Thus, a venire member who expresses an apparent or possible bias is not necessarily disqualified if further questioning shows he can be impartial. *Id*. at 93.

In the present case, venire member Earlyn Tompkins indicated that because she had many pipelines on her property and some of them were not properly maintained, she would "possibly" lean in favor of the landowner, Donnell Lands, and might "start out" more in favor of the landowner. Thereafter, Tompkins said she thought she could listen to the evidence, and she might "lean a little toward the landowner, but [] would try to do (sic) the middle of the line." Later, when asked by the trial judge if she could be fair to both sides, or if one side was already ahead and the other was already behind, she answered, "I can be fair."

Next, venire member Joe Verastegui stated he had known the Donnells his entire life, was good friends with them, and had sold them feed. When asked if he could put his friendship aside and consider the case with both parties "start[ing] [] out even," he said he thought he "could be fair" and he "wouldn't have a problem." When asked if his business relationship with the Donnells would cause him to lean slightly in favor of Donnell Lands, he stated it "probably would a little bit," but he thought he "could be fair about it." When asked if both sides would start at the same place or if Donnell Lands would start out a little ahead of LaSalle, Verastegui added that "it would be hard," but again he "thought he could be fair." Later, when questioned by the trial judge, Verastegui indicated he would be able to put his relationship with the Donnells aside and decide the case as if "strangers" were involved.

Here, LaSalle argues Tompkins and Verastegui unequivocally stated their leanings in favor of Donnell Lands, and therefore, they were disqualified as a matter of law. We disagree.

The record fails to establish Tompkins and Verastegui would base their verdict on their feelings, rather than on the evidence and the law. Although both challenged venire members expressed apparent or possible bias, further questioning showed they could be impartial. Viewed as a whole, the record fails to show that Tompkins and Verastegui were biased as a matter of law. We conclude the trial court did not err in denying LaSalle's challenges for cause.

### CONCLUSION

Although the jury awarded damages in the amount of $19,206.00 for the temporary workspace easements, we conclude the evidence is sufficient to support a finding of only $6,402.00. The difference between $19,206.00 and $6,402.00 is $12,804.00. We, therefore, modify the judgment to reflect a reduction of $12,804.00 in the total damages awarded. We affirm the judgment as modified.

Karen Angelini, Justice