**Opinion filed June 26, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00036-CV
_____

## TIFFANY GONZALEZ, Appellant

## V.

## BLANCA HINOJOS SANCHEZ D/B/A E&G SANCHEZ TRUCKING, Appellee

**On Appeal from the 385th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV58809**

## O P I N I O N

Motorists are encouraged not to operate a motor vehicle while using portable wireless communication devices for electronic messaging purposes—to send and receive text messages or other such communications—because those that do may become distracted and less attentive than those that do not. In fact, the controlling statute dictates that such conduct is prohibited and constitutes a punishable offense. *See* TEX. TRANSP. CODE ANN. § 545.4251(b), (e), (f), (g) (West 2022).

The matter before us originates from a motor vehicle accident that involved Appellant, Tiffany Gonzalez, the plaintiff in the underlying suit, and Eladio Caballero Sanchez, the driver of the other vehicle (a truck-tractor) and the owner of E&G Sanchez Trucking. Tiffany later filed a personal injury suit against Eladio and E&G.[1] After a jury trial, the jury found Tiffany and Eladio negligent and, in the comparative negligence findings, assessed 60% of the responsibility for the accident to Tiffany and 40% to Eladio. In light of the jury's findings, the trial court signed a take-nothing judgment in favor of Eladio and E&G. *See Nabors Well Services, Ltd. v. Romero*, 456 S.W.3d 553, 559–60 (Tex. 2015) (citing TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001, .012 (West 2020)).

On appeal, Tiffany complains that: (1) the evidence presented at trial was legally and factually insufficient to support the jury's negligence findings; and (2) the trial court abused its discretion when it admitted Tiffany's cell phone records. We affirm.

## I. *Factual Background*

On October 16, 2020, Tiffany was driving her Dodge Durango when it collided with a truck-tractor driven by Eladio and owned by E&G at the intersection of F.M. 846 and U.S. Highway 87 near Big Spring. Eladio was towing a trailer of caliche and headed east on F.M. 846; Tiffany's vehicle was headed south on U.S. Highway 87. Eladio's vehicle stopped at the stop sign at the intersection. As her vehicle approached this intersection, Tiffany saw the truck-tractor driven by Eladio "enter the intersection"; she "swerved" her vehicle to the left but nevertheless collided with Eladio's vehicle.

---

[1] Eladio is not a party to this appeal. Eladio passed away prior to being served with Tiffany's original petition. After Eladio passed, his wife, Blanca Sanchez, continued to own and operate E&G Sanchez Trucking and was subsequently joined as a party to the underlying suit in that capacity. No party argues that Eladio's death affects the disposition of this appeal.

The image below is reproduced from the Texas Department of Public Safety (DPS) Peace Officer's Crash Report, which illustrates the accident scene; Tiffany's vehicle is depicted as Unit 3 and Eladio's truck-tractor is depicted as Unit 1, Towing Unit 2.



During pretrial proceedings, Tiffany filed a motion in limine and sought to exclude, among other things, any reference to or discussion of her cell phone activity on the accident date. The trial court denied Appellant's motion. Tiffany also raised certain evidentiary objections.

Tiffany's trial counsel first objected to the admission of a Call Sheet Report from Howard County, which was a record of all phone calls that were made to emergency services in that area on October 16, 2020. In this regard, Tiffany's trial counsel made the following argument concerning the admissibility of the call sheet and Tiffany's cell phone records:

> So the issue is that I argue because the cell phone expert that they've hired offers no opinion about causation and cannot say that these supposed [thirty] text messages that are, in our view, voice messages, had any role in the last minute when this intersection was being

3

approached, that all of the exhibits from their cell phone expert, including these [9-1-1] call records, are irrelevant, or at least it's outweighed by the unfair prejudice of the whole discussion about the cell phone records.

The trial court overruled Tiffany's objections and stated that Tiffany's cell phone records would be admitted at trial. In addition to these cell phone records and other documentary evidence, the following testimony was presented to the jury.

A. *Trooper Max Gouge*

Trooper Max Gouge with DPS investigated the accident on October 16, 2020. Trooper Gouge stated that, although he has been trained to perform accident reconstruction analysis, he did not perform a complete "accident reconstruction" for this collision. Instead, Trooper Gouge created a DPS crash report, which detailed the findings of his investigation and included an illustration of his conclusions regarding where the collision had occurred.

According to the crash report, Trooper Gouge was first notified of the collision at 2:04 p.m. When asked about the accuracy of the times listed in his report, Trooper Gouge confirmed that the "times listed on a crash report [are not] necessarily accurate" because they are based on when an accident is reported to dispatch. Approximately one hour after he was notified, Trooper Gouge arrived at the accident scene. Trooper Gouge spoke to Howard County Sheriff's deputies that were present at the scene, surveyed the intersection, and assessed the condition of the vehicles that were involved. Additionally, Trooper Gouge testified that he took several photographs of the accident scene; these images were included with his crash report.

Trooper Gouge noted the following observations in the crash report concerning the accident scene: (1) the visibility at the intersection was "clear"; (2) the speed limit for vehicles traveling on U.S. Highway 87 was seventy-five miles

per hour; (3) there was a hill on U.S. Highway 87 in the direction that Tiffany had traveled; (4) there was a stop sign that controlled eastbound traffic on F.M. 846 where the two highways intersected; (5) after the collision, the vehicles came to a rest at the median of the roadway; and (6) there was "fluid all over the roadway." Trooper Gouge also noted that, while part of the truck-tractor operated by Eladio was in the southbound turn lane of U.S. Highway 87, the "thru lanes" on the roadway remained unobstructed.

Based on his investigation, Trooper Gouge opined that the damage he observed to the vehicles was consistent with Tiffany "swerving to the left" before the collision occurred, and her vehicle colliding with Eladio's truck-tractor at a "pretty significant" angle. Trooper Gouge did not determine either the point of impact or the speed that the vehicles were traveling; however, he opined that, from his experience and training, vehicles "sometimes move in the moments immediately following [a] crash." Trooper Gouge did not recall any evidence at the scene that showed that Tiffany attempted to reduce the speed of her vehicle before the collision, such as braking or "skid marks." Further, the DPS crash report notes that "the only skid marks on scene were when [Tiffany's vehicle] collided with [Eladio's vehicle]."

After surveying the accident scene, Trooper Gouge spoke to Tiffany and Eladio about the circumstances of the accident. According to Trooper Gouge, Eladio told him that he had stopped "either at the stop sign or near the stop sign [on F.M. 846]. He had started [to cross the intersection] and a car was coming, and then he got hit." In Trooper Gouge's bodycam footage, Eladio can be heard telling Trooper Gouge that he "stopped" at the intersection and waited for other vehicles to pass the intersection on the north-side of U.S. Highway 87—the opposite direction that Tiffany's vehicle was traveling. Eladio then said that, after these other vehicles had passed, he "started moving" across the intersection and—at some point while he was

5

crossing—he saw Tiffany's vehicle traveling south on U.S. Highway 87 before it collided with his truck-tractor.

Tiffany told Trooper Gouge that her vehicle was traveling south from Lubbock on U.S. Highway 87. She stated that, at some point prior to the collision, she passed a vehicle in the left, southbound-lane of U.S. Highway 87; she then changed lanes into the right, southbound-lane. Then, "just after she passed the car," she saw a truck-tractor enter the intersection. Tiffany told Trooper Gouge that she "guess[ed] [Eladio] passed the stop sign . . . [and she] had already saw that [Eladio] was coming . . . so [she] swerved" to "miss" or "go around" the truck-tractor before the collision. In Trooper Gouge's bodycam video, Tiffany can be seen looking down and using her cell phone during her conversation with Trooper Gouge and telling him that she is "going to send a screenshot" to someone and that her "phone screen is kind of cracked." However, Tiffany did not make any statements to Trooper Gouge concerning the use of her cell phone while she was driving, and he had no knowledge as to whether she was using her cell phone when the accident occurred.

Trooper Gouge identified certain "contributing factors" in the crash report that he associated with the collision. Trooper Gouge stated that, in his opinion, Eladio failed to yield the right-of-way to other motorists. He also opined that, in general, "18-wheelers" need to yield "more space" to oncoming vehicles because they are longer and have a slower mode of acceleration in comparison to other vehicles. Additionally, Trooper Gouge testified about the potential dangers of being distracted while driving and stated that "bad things can happen" when a person is distracted—such as when they are texting and driving—and that he recommends motorists remain "one hundred percent" focused on the roadway when driving at a speed of seventy-five miles per hour. Trooper Gouge also said that his conclusions about the accident's contributing factors "would not change" if he knew that Tiffany had sent or received a text message "a minute prior" to the accident.

### B. *Blanca Sanchez*

Blanca Sanchez testified about Eladio's experience as a commercial truck driver, his role with the company, and statements that he made to her about the accident. She stated that Eladio first received a Texas commercial driver's license in 2019, and that he had operated "dumping trucks" in the 1980s prior to being licensed in Texas. Thereafter, in 2019, she and Eladio formed E&G, a transportation company. In addition to his role as owner of E&G, Eladio was a commercial truck driver for the company.

Blanca believed that Eladio was a "cautious" driver. Blanca also testified that she was aware of an incident that occurred on August 8, 2020, where Eladio was "caught running a stop sign while driving a commercial motor vehicle." Regarding Eladio's statements about the accident, Blanca testified that Eladio told her that "he did stop at the stop sign, [and] that he had already crossed when [Tiffany] hit [him]." She also stated that Eladio "knew a little English," but that he did not know enough to effectively communicate with police officers.

### C. *Tiffany Gonzalez*

Tiffany testified that she left Lubbock around noon on October 16, 2020; she intended to drive to San Antonio. She stated that the accident occurred around "an hour" or "hour-and-a-half" after she left Lubbock. She was familiar with this route, and she described the section of U.S. Highway 87 where the accident occurred as being "flat." Tiffany testified she could see "pretty far" and that there was nothing that obstructed her vision or line of sight while she drove.

Tiffany admitted that due to "issues at work," she "had to" send approximately thirty text messages to various coworkers as she drove to San Antonio.[2] However, despite admitting to sending several text messages while she drove, Tiffany could

---

[2]At trial, Tiffany admitted that, when she was deposed, she had previously denied using her cell phone while driving on the accident date.

not recall how much time elapsed between the last message that she received or sent and when the accident occurred. Additionally, in clarifying the extent of her cell phone activity, Tiffany stated that she did not manually use her cell phone while driving that day; rather, her vehicle's Bluetooth device would "read" the text messages to her as she drove, and she would then respond to these messages through voice commands. Tiffany stated that, although she was able to use her cell phone, it was "messed up" and "the screen was shattered" so she was unable to manually send text messages while driving "even if [she] had wanted to." She also testified that while she could not remember where her cell phone was located as she drove, she believed that it was "either on the seat or on the floor" of her vehicle.

Tiffany's statements concerning her perception of where Eladio's vehicle was located at the intersection prior to the collision were inconsistent. She stated that she "knew" there was a "semi" approaching the stop sign at the intersection before the collision occurred, and that she expected Eladio to "make a stop." However, Tiffany did not remember what her vehicle's distance was from the intersection when she first saw Eladio's truck-tractor approaching the stop sign. Later, she stated that she did not see Eladio's truck-tractor until she was "pretty close" to the intersection, which was after she had passed a vehicle and entered the southbound right lane of U.S. Highway 87. Tiffany also said that the middle of Eladio's truck-tractor was past the stop sign when she first saw him and that "nothing prevent[ed] [her] from seeing him coming."

Tiffany also made several inconsistent statements concerning the distance between when she had passed another vehicle traveling southbound on U.S. Highway 87 and the intersection where the collision occurred. Tiffany initially testified that her vehicle's cruise control was activated when she passed a vehicle before she entered the southbound, right-lane of U.S. Highway 87, and that she was not speeding at that time. Later, she testified that she deactivated the cruise control

8

and accelerated to pass the vehicle and switch lanes. Tiffany also admitted that she previously stated she "maintain[ed] [the] outside lane . . . for a couple of miles before the accident happened," and that she did not pass any vehicles before the accident occurred. In clarifying her conflicting statements, she said that she passed a vehicle before the accident, but she did not know "how far . . . in advance to the accident" she passed the vehicle, or where the "other vehicle ended up" after the accident.

After noticing Eladio's truck-tractor, Tiffany "stepped on" her brakes and "swerved" her vehicle "significantly to the left" to avoid the collision. Tiffany stated that she did not know how much time elapsed from the moment that she first saw Eladio's truck-tractor to when the collision occurred; however, she did state that she was "probably" traveling less than seventy-five miles per hour when the collision occurred. She testified that the collision occurred in the southbound, right lane of U.S. Highway 87, and that the impact only damaged the passenger side of her vehicle. When asked if she believed that she could have avoided the collision by swerving to the right, Tiffany stated that "either way it was going to be an impact." Tiffany further testified that she did not believe that she could have avoided the accident by "slamm[ing] on" her brakes.

Tiffany called her mother after the accident. While she was talking to her mother, Eladio approached her vehicle. She stated that Eladio was visibly upset and told her, in Spanish, that the accident "was [her] fault" and that she "should have seen him." Tiffany testified that after she finished the phone call with her mother, a passerby stopped and told her that he had "already called [9-1-1]" to report the accident. Trooper Gouge then arrived at the scene approximately an hour later.

D. *Shanon Burgess*

Shanon Burgess testified concerning the content of Tiffany's cell phone records. Burgess has experience in computer science and mathematics, he has been trained in digital forensics, and he is a certified wireless analyst. He reviewed

Tiffany's cell phone records that spanned a two-hour window—12:25 p.m. to 2:25 p.m.—on the accident date. Burgess testified about the different acronyms, numbers, and columns listed on Tiffany's cell phone records and explained their meaning. He stated that Tiffany received more than thirty text messages on her cell phone during the, approximately, thirty-minutes that preceded the accident.

Burgess testified that, based on the 9-1-1 Call Sheet Report and Tiffany's cell phone records, he determined that the accident occurred "just before" 1:23 p.m. According to Burgess, Tiffany's cell phone records indicated that she called her mother after the accident at 1:23 p.m. and that the last text message Tiffany received prior to the accident was at 1:18 p.m.; however, he could not ascertain from this data the exact time that the accident occurred or how much time had elapsed from when she last sent or received a text message and when the accident occurred. Nevertheless, Burgess estimated that the last text message was sent to or received by Tiffany approximately three to five minutes before Tiffany called her mother. Burgess also testified that he could not determine whether Tiffany had listened to or read the text messages that she received.

## II. *Standards of Review*

### A. *Legal Sufficiency of the Evidence*

The standard for legal sufficiency is whether the evidence in support of the challenged finding rises to a level that would enable reasonable and fair-minded people to arrive at the verdict under review. *W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 897–98 (Tex. 2020); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). When a party challenges the legal sufficiency of the evidence supporting an adverse finding on which that party did not have the burden of proof at trial, the party must demonstrate that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). Under a legal sufficiency review, we consider all the evidence in the light

most favorable to the prevailing party, make every reasonable inference in that party's favor, and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 807, 822, 827. We may not substitute our judgment for that of the factfinder if the evidence falls within the zone of reasonable disagreement. *Id.* at 822. This standard also prevents a reviewing court from substituting its judgment for the factfinder on matters of credibility. *Id.* at 816–17.

We will sustain a challenge to the legal sufficiency of the evidence if (1) evidence of a vital fact is absent, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 783 (Tex. 2020) (citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004)); *City of Keller*, 168 S.W.3d at 810. "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions." *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). "However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

B. *Factual Sufficiency of the Evidence*

When reviewing a factual sufficiency challenge, we "must consider and weigh all of the evidence," not just the evidence that supports the factfinder's finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We must review the evidence in a neutral light. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). If we set aside a judgment on the basis that a vital finding is not supported

11

by factually sufficient evidence, we must detail the evidence that is relevant to the issue and specify how the contrary evidence greatly outweighs the evidence that supports the finding. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

If a party challenges the factual sufficiency of an adverse finding on an issue for which it had the burden of proof at trial, it must demonstrate on appeal "that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem.*, 46 S.W.3d at 242. However, when a party challenges the factual sufficiency of the evidence supporting a finding on an issue for which it did not have the burden of proof at trial, we will set aside the finding only if the evidence in support of the finding is so weak or contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Pool*, 715 S.W.2d at 635; *Cowan v. Worrell*, 638 S.W.3d 244, 253 (Tex. App.—Eastland 2022, no pet.).

C. *Admissibility of Evidence*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020) (citing *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005)). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *Abilene Reg. Med. Ctr. v. Pierce*, 684 S.W.3d 564, 569 (Tex. App.—Eastland 2024, pet. denied). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Further, an appellate court should not reverse based on a trial court's erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1; *Malone*, 972 S.W.2d at 43; *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 421 (Tex. App.—Eastland 2006, no pet.); *see Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989).

12

### III. *Analysis*

#### A. *Negligence and Causation Principles*

In her first issue, Tiffany argues that the evidence is legally and factually insufficient to support the jury's proportionate responsibility findings—namely, that her percentage of responsibility for causing the accident was 60%.[3]  Additionally, Tiffany contends that, if we conclude that the evidence is legally or factually insufficient to support the jury's proportionate responsibility findings, the trial court also erred when it submitted the proportionate responsibility question to the jury. *See* CIV. PRAC. & REM. § 33.003(b).  As such, we must first determine whether the evidence is legally and factually sufficient to support the jury's findings.  *See Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 210 (Tex. 2015).

"Accidents happen . . . but not all accidents are evidence of negligence." *Losada v. Posada*, No. 23-1015, 2025 WL 1717009, at *3 (Tex. June 20, 2025) (per curiam) (citing *Porterfield v. Brinegar*, 719 S.W.2d 558, 559 (Tex. 1986)).  Thus, simply because an automobile accident has occurred does not necessarily establish negligence as a matter of law. *Rankin v. Nash-Tex. Co.*, 105 S.W.2d 195, 199 (Tex. 1937); *Gomez v. Adame*, 940 S.W.2d 249, 252 (Tex. App.—San Antonio 1997, no writ).  The plaintiff has the burden to prove specific acts of negligence on the part of the defendant and that such negligence was a proximate cause of the accident and her claimed injuries.  *Gomez*, 940 S.W.2d at 252.  Whether the plaintiff succeeds in proving these elements by a preponderance of the evidence is a matter for the factfinder to determine. *Id.*

---

[3]We note that Tiffany refers to proportionate responsibility as "contributory negligence" throughout her appellate brief.  *See Dugger v. Arredondo*, 408 S.W.3d 825, 832 (Tex. 2013) (The statutory scheme of proportionate responsibility "indicates the Legislature's desire to compare [the parties] responsibility for injuries rather than [to] bar recovery, even if the claimant was partly at fault or violated some legal standard."); CIV. PRAC. & REM. §§ 33.001–.017 (West 2020 & Supp. 2024).

Proportionate responsibility applies when an injured person fails to use ordinary care regarding his or her safety. *Austin*, 465 S.W.3d at 209–10; *see Romero*, 456 S.W.3d at 559. "Under proportionate responsibility, the fact-finder apportions responsibility according to the relative fault of the actors, thus allowing a plaintiff to recover while reducing that recovery by the percentage for which the plaintiff was at fault." *Romero*, 456 S.W.3d at 559–60. A plaintiff who is found to be no more than 50% responsible for her claimed injuries is entitled to recover a corresponding percentage of the damages awarded to her by the factfinder; however, such recovery will be reduced by the percentage of responsibility assigned to her. *See id.* at 560 (citing CIV. PRAC. & REM. §§ 33.001, 33.012). As relevant here, the term "percentage of responsibility" is defined, in part, as:

> [T]hat percentage, . . . attributed by the trier of fact to each claimant, [or] each defendant . . . with respect to *causing or contributing to cause in any way, whether by negligent act or omission, . . . by other conduct or activity [that is] violative of the applicable legal standard*, or by any combination of the foregoing, the *personal injury, . . . or other harm for which [the] recovery of damages is sought.*

CIV. PRAC. & REM. § 33.011(4) (emphasis added).

Section 33.011(4) instructs the factfinder to assign a percentage of responsibility to a plaintiff who seeks a personal-injury damages recovery—such as Tiffany did in this case—and who the factfinder finds has caused or contributed to cause "in any way" the alleged personal injury, harm, or damages sought. *Id.* Thus, personal-injury plaintiffs are accountable for "causing or contributing to cause *in any way the harm for which [the] recovery of damages is sought.*" *Id.* § 33.003(a) (emphasis added). The phrase "in any way" means "only what it says—there are no restrictions on assigning responsibility to a plaintiff [provided] it can be shown [that] the plaintiff's conduct 'caused or contributed to cause' [her] personal injury." *Romero*, 456 S.W.3d at 562.

14

Although a finding of contributory negligence may no longer bar a plaintiff's recovery, "the underlying concepts remain relevant under Texas's proportionate-responsibility statute." *Austin*, 465 S.W.3d at 209–210. "To establish contributory negligence, a defendant must prove [that] (1) the plaintiff was negligent, and (2) the plaintiff's negligence was a proximate cause of [her] injury." *Kay v. N. Tex. Rod & Custom*, 109 S.W.3d 924, 927 (Tex. App.—Dallas 2003, no pet.). "[C]ontributory negligence is a plea in confession and avoidance because the defense allows a negligent defendant to defeat the plaintiff's recovery either partially or completely, depending on the percentage of the plaintiff's [assigned] responsibility." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156 (Tex. 2015); *see Austin*, 465 S.W.3d at 209–10. Thus, "the burden of proof is on the defendant to present sufficient evidence to establish [this] defense and obtain the requisite jury findings." *Zorrilla*, 469 S.W.3d at 156.

Motorists have a common-law duty to exercise ordinary care and must act as a reasonably prudent motorist would act toward other motorists under the same or similar circumstances. *See Lozada*, 2025 WL 1717009, at *2 (citing *Perry v. S.N.*, 973 S.W.2d 301, 306 (Tex. 1998)); *see also Douglas v. Aguilar*, 599 S.W.3d 105, 108 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *Hoffman v. Wright*, No. 11-12-00017-CV, 2014 WL 709557, at *3 (Tex. App.—Eastland Feb. 21, 2014, no pet.) (mem. op.). Moreover, while motorists are not required to anticipate the negligent conduct of another, they have a duty to use ordinary care to prevent injury to themselves, including a duty to keep a proper lookout for their safety and the safety of others. *See Montes v. Pendergrass*, 61 S.W.3d 505, 509 (Tex. App.—San Antonio 2001, no pet.) (citing *Lynch v. Ricketts*, 314 S.W.2d 273, 275 (Tex. 1958)); *see also Hoffman*, 2014 WL 709557, at *3.

"The duty to keep a proper lookout encompasses the duty to observe, in a careful and intelligent manner, traffic and the general situation in the vicinity,

including [the] speed and proximity of other vehicles as well as [the] rules of the road and common experience." *Carney v. Roberts Inv. Co.*, 837 S.W.2d 206, 210 (Tex. App.—Tyler 1992, writ denied); *see Lynch*, 314 S.W.2d at 275; *Thornton v. Campise*, 459 S.W.2d 455, 458 (Tex. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e); *Hatcher v. Mewbourn*, 457 S.W.2d 151, 152 (Tex. App.—Texarkana 1970, writ ref'd n.r.e.). In cases that involve intersectional collisions, like the one before us, the motorist with the right-of-way ordinarily has a duty to keep a proper lookout for other vehicles that enter an intersection, and their failure to do so constitutes negligence. *See Thornton*, 459 S.W.2d at 458; *Melvin v. Jimenez*, No. 04-00-00746-CV, 2002 WL 21963, at *1 (Tex. App.—San Antonio Jan. 9, 2002, no pet.) (not designated for publication); *see also Stanley v. S. Pac. Co.*, 466 S.W.2d 548, 553 (Tex. 1971).

Proximate cause is generally a question of fact. *Boyd v. Fuel Distribs., Inc.*, 795 S.W.2d 266, 272 (Tex. App.—Austin 1990, writ denied) (citing *Mo. Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 104–05 (Tex. 1977)). It encompasses two elements: cause in fact and foreseeability. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004) (citing *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992)).

"Cause in fact" means that the act or omission was a substantial factor in bringing about the injury, and without it the harm would not have occurred. *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016); *Travis*, 830 S.W.2d at 98 (citing *Kerby v. Abilene Christian Coll.*, 503 S.W.2d 526, 528 (Tex. 1973)). "'Foreseeability' means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that [her] negligent act created for others." *Travis*, 830 S.W.2d at 98 (first citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549–50 (Tex. 1985); and then citing *Mo. Pac. R.R. Co.*, 552 S.W.2d at 103). There may be more than one proximate cause of an injury. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d

470, 471 (Tex. 1991). Further, the failure to keep a proper lookout may constitute a proximate cause of a collision if (1) the motorist should have observed the circumstance in time to avoid the collision by taking appropriate evasive action, and (2) but for such failure, the collision could have been avoided. *Montes*, 61 S.W.3d at 510.

Thus, we must consider whether the record contains legally and factually sufficient evidence to establish that Tiffany was negligent because she (1) failed to keep a proper lookout, and/or (2) should have been alerted to the danger of a potential collision in time to avoid it. *See id.*; *Dallas Ry. & Terminal Co. v. Walsh*, 156 S.W.2d 320, 324 (Tex. App.—Eastland 1941), *aff'd*, 167 S.W.2d 1018 (Tex. 1943); *see also Melvin*, 2002 WL 21963, at *1.

B. *Admissibility of Tiffany's Cell Phone Records*

Tiffany argues that the evidence is legally and factually insufficient to support the jury's proportionate responsibility findings because (1) her cell phone records were not legally sufficient evidence of her alleged negligence as a matter of law, and (2) there is no evidence that she failed to keep a proper lookout or that her conduct was a proximate cause of the collision and her claimed injuries. Tiffany further argues that the trial court abused its discretion when it admitted her cell phone records because this evidence was not relevant to the jury's negligence and proportionate responsibility determinations. Conversely, Appellee argues that Tiffany's cell phone records were highly relevant to the jury's determinations and thus constitute legally and factually sufficient evidence of her negligence, and that the totality of evidence admitted at trial is legally and factually sufficient to support the jury's negligence and proportionate responsibility findings.

In her second issue, Tiffany argues that her cell phone records were not relevant to the jury's determinations and do not establish that she was negligent; thus, the trial court abused its discretion when it admitted them. In her legal

17

sufficiency challenge, Tiffany specifically contends that "even when [irrelevant evidence] is admitted into evidence, irrelevant evidence is still incompetent and cannot support a judgment because it, by definition, does not tend to make the existence of the fact at issue more or less probable." *See LaSalle Pipeline L.P. v. Donnell Lands, L.P.*, 336 S.W.3d 306, 315 (Tex. App.—San Antonio 2010, pet. denied) (citing *Gen. Motors Corp. v. Iracheta*, 161 S.W.3d 462, 470–71 (Tex. 2005)). However, "[f]or purposes of the proportionate-responsibility statute, the Legislature both intends and requires fact-finders to consider relevant evidence of a plaintiff's pre-occurrence, injury-causing conduct." *See Romero*, 456 S.W.3d at 563.

Tiffany relies on three mandamus opinions to support her argument that her cell phone records do not legally or factually show that her alleged cell phone activity constituted an act of negligence. *See In re Kuraray Am., Inc.*, 656 S.W.3d 137, 142–45 (Tex. 2022) (orig. proceeding) (per curiam); *In re Huang*, No. 01-22-00594-CV, 2023 WL 8262837, at *3 (Tex. App.—Houston [1st Dist.] Nov. 30, 2023, orig. proceeding) (mem. op.); *In re UV Logistics, LLC*, No. 12-20-00196-CV, 2021 WL 306205, at *1, *4–5 (Tex. App.—Tyler Jan. 29, 2021, orig. proceeding) (mem. op.). Tiffany primarily relies on *Kuraray* for the proposition that, while her cell phone records show that she sent a text message—the length and content of which is unknown—approximately three to five minutes before the collision occurred, this conduct alone was too remote to have contributed to her failure to maintain a proper lookout. To the contrary, Appellee argues that the opinions upon which Tiffany relies support the conclusion, and the trial court's determination, that her cell phone records were relevant evidence of her negligent conduct.

In *Kuraray*, the owner and operator of an ethylene plant was sued for negligence arising from a chemical release from one of the plant's reactors. 656 S.W.3d at 140–41. In response to a discovery request, the plant owner produced

seventeen hours of cell phone records that pertained to company-issued cell phones that were used by several employees on the date of the chemical release. *Id.* After receiving this document production, the plaintiffs requested the disclosure of additional employee cell phone records that predated this incident, which the plaintiffs alleged were relevant to show that cell phone use by plant employees was a contributing factor to the chemical release. *Id.* In support of this discovery request, the plaintiffs cited (1) deposition testimony that the plant had encountered problems in the past with employee cell phone use in the plant control room, and (2) an anonymous e-mail expressing concerns about "cell phone abuse" by plant employees. *Id.* The trial court ultimately ordered the production of several months of employee cell phone records—spanning from the date of the chemical release to the date of the anonymous e-mail's receipt. *Id.*

The Texas Supreme Court, in addressing this scenario, established guidelines for courts to follow in determining the *scope of permissible discovery* with regard to the production of cell phone data in negligence cases, namely that: (1) the party seeking the production of cell phone data must "allege or provide some evidence of cell-phone use by the person whose data is sought at a time when it could have been a contributing cause of the incident on which the claim is based"; (2) once this burden is met, the trial court may then order the production of relevant cell phone data "provided its temporal scope is tailored to encompass only the period in which cell-phone use could have contributed to the incident"; and (3) only if the initial production indicates that cell phone use could have contributed to the incident, "may a trial court [then] consider whether additional discovery regarding cell-phone use beyond that timeframe may be relevant." *See id.* at 142–43.

The court in *Kuraray* noted that, while there was some evidence that two plant employees had used their cell phones during the relevant timeframe, the party seeking discovery (the plaintiffs) did not meet their burden to show that the nature,

19

duration, and frequency of the employees' cell phone activity occurred before the chemical release and could have contributed to the plaintiffs' injuries. *Id.* at 145. Thus, the court concluded that the trial court abused its discretion when it ordered the production of the additional "earlier" cell phone records. *Id.*; *but see In re Huang*, 2023 WL 8262837, at *4 (granting mandamus relief where a plaintiff demonstrated that the production of cell phone data—which was limited to one hour before and one hour after the collision—may have been a contributing factor to the accident, but the trial court's discovery order failed to provide reasonable guidelines for the protection of sensitive data); *UV Logistics*, 2021 WL 306205, at *4–5 (granting mandamus relief where, even though the plaintiff demonstrated a "reasonable need" for cell phone data to prove whether a truck driver was using his cell phone at the time of the accident, the trial court ordered the production of social media records and cell phone data without a subject matter limitation).

Importantly, the opinions upon which Tiffany relies to support her argument—*Kuraray*, *Huang*, and *UV Logistics*—only concerned whether cell phone records and data, based on the circumstances in each case, were *discoverable*. Indeed, although relevant evidence, subject to certain exceptions, is generally admissible, evidence that is deemed to be discoverable may not necessarily be admissible at trial. *See* TEX. R. CIV. P. 192.3(a); TEX. R. EVID. 401–403. In this case, Tiffany's complaint centers on the *admissibility* of her cell phone records and we note that neither party to this appeal has cited to any Texas authority on this point—*admissibility*. However, in the context of *admissibility*, we believe that the guidelines set forth in *Kuraray*—even though the court's holdings focused only on the parties' discovery dispute—are instructive and shape our analysis.

We conclude that to be admissible, the proffered evidence of cell phone activity must be tethered in temporal proximity to a defined period of time in which the cell phone usage could have caused or contributed to cause in any way the

complained-of negligent conduct. The standard that we have announced today was met in this case. Unlike the "earlier" cell phone records that were sought in *Kuraray*—which spanned a period of seventeen hours—Tiffany's cell phone records that the trial court admitted were limited to her cell phone activity that spanned a much narrower window (approximately forty minutes immediately before and sixty minutes after the collision occurred—12:43 p.m. through 2:23 p.m.). As such, Tiffany's cell phone records encompassed a temporally relevant period that were related to her pre-occurrence, injury-causing conduct. *See Romero*, 456 S.W.3d at 563-64; *In re Huang*, 2023 WL 8262837, at *4; *see also* CIV. PRAC. & REM. §§ 33.001, .003, .011, .012.

In many cases, we recognize that conflicting testimony is presented at trial. This case is no exception. Despite this, we conclude that the record before us contains legally and factually sufficient evidence that Tiffany's cell phone activity could have caused or contributed to cause the accident and her claimed injuries. Tiffany testified that the accident occurred around "an hour" or "hour-and-a-half" after she left Lubbock; she also stated that she called her mother after the accident. Trooper Gouge confirmed that, although the crash report stated that the accident occurred at 2:04 p.m., the "times listed on a crash report [are not] necessarily accurate." Moreover, Tiffany testified that (1) she sent and received multiple text messages because of "an issue at work" while driving seventy-five miles-per-hour in route to San Antonio, (2) she could not remember when she last sent or received a text message on her cell phone before the collision occurred, and (3) she could not recall where her cell phone was located inside her vehicle before the collision. Further, when deposed, she also denied using her cell phone while driving that day.

Based on this record, we conclude that Tiffany's cell phone records were relevant and admissible to show whether her cell phone activity caused or contributed to cause in any way this accident and her claimed injuries—i.e., that her

21

cell phone activity while driving prevented her from being attentive and keeping a proper lookout and caused or contributed to cause in any way this collision and her resulting injuries. *See Kuraray*, 656 S.W.3d 143–45; *Huang*, 2023 WL 8262837, at *4; *Greater San Antonio Transp. Co. v. Polito*, No. 04-10-00330-CV, 2011 WL 2893080, at *4 (Tex. App.—San Antonio July 20, 2011, pet. denied) (mem. op.) (holding that a layperson may be able to determine whether activity inside a vehicle is a distraction). Therefore, we conclude that the trial court did not abuse its discretion when it admitted Tiffany's cell phone records.

Accordingly, we overrule Tiffany's second issue.

C. *Other Sufficiency Challenges*

Tiffany cites to multiple opinions to support her contention that the jury's negligence findings cannot be supported by legally or factually sufficient evidence *unless* there is evidence of either (1) the time that elapsed between her recognition of the danger and when the accident occurred, or (2) the physical distance between her vehicle and Eladio's truck-tractor once she became aware that a collision was possible. *See Ciguero v. Lara*, 455 S.W.3d 744, 749 (Tex. App.—El Paso 2015, no pet.); *see also Vicknair v. Peters*, No. 12-13-00034-CV, 2014 WL 357082, at *4 (Tex. App.—Tyler Jan. 31, 2014, no pet.) (mem. op.); *Turner v. Cruz*, No. 04-10-00313-CV, 2010 WL 5545392, at *4 (Tex. App.—San Antonio Dec. 29, 2010, no pet.) (mem. op.); *Kahng v. Verity*, No. 01-07-00695-CV, 2008 WL 2930195, at *5 (Tex. App.—Houston [1st Dist.] July 31, 2008, no pet.) (mem. op). To this point, Tiffany primarily argues that *Ciguero* is controlling because the only evidence of causation in that case consisted of the appellant's testimony that a collision occurred concurrently with or immediately preceding his recognition of a road hazard; therefore, such evidence would be insufficient to establish proximate cause. 455 S.W.3d at 749.

In *Ciguero*, a motorist struck a pedestrian who was running along a highway while being pursued by United States Customs and Border Protection (CBP) officers. *Id.* at 746. The pedestrian later died, and his estate brought a negligence suit against the motorist. *Id.* The motorist filed a no-evidence motion for summary judgment, which the trial court granted. *Id.* The court noted that the only competent summary judgment evidence presented was the motorist's deposition testimony, in which he stated that: (1) he did not see the CBP vehicles until after the collision; (2) he did not remember how fast his vehicle was traveling (but he later stated that he was "driving at or under 55 miles per hour"); (3) he did not know if he applied the brakes to his vehicle before the collision; and (4) that "the collision happened so quickly that he did not have a chance to do anything to avoid it." *Id.* In affirming the trial court's grant of the motorist's no-evidence motion, the court held that "[a motorist's] testimony that a collision occurred concurrent with or immediately preceding his recognition of a road hazard, *standing alone*, constitutes no evidence on the issue of proximate cause because it does not raise a fact issue on whether the accident could have been avoided." *Id.* at 749 (emphasis added).

The facts before us are distinguishable from *Ciguero*, and the other opinions cited by Tiffany on this point, because there are additional facts in the record to consider—such as Tiffany's use of her cell phone while driving that day and her cell phone records—which, as we have already discussed, constitutes legally and factually sufficient evidence of her failure to be attentive and maintain a proper lookout under the circumstances. *See id.* at 746–49. Moreover, the opinions cited by Tiffany concern summary judgment proceedings, where a limited record was considered, whereas the case before us was a trial on the merits, which allowed Tiffany to fully develop the record. Here, there is legally and factually sufficient evidence of probative value to support the jury's findings that Tiffany failed to keep a proper lookout and that such failure was a proximate cause of or contributed to

cause the accident and her resulting injuries. *See Montes*, 61 S.W.3d at 510; *Morriss v. Centex Paving Co.*, 348 S.W.2d 790, 792 (Tex. App.—Eastland 1961, writ ref'd n.r.e.).

Despite this, Tiffany also contends that the evidence shows that she did not fail to keep a proper lookout because (1) she was "within her rights" to expect Eladio to stop at the intersection and yield-the-right-of-way to her vehicle, (2) she testified that she could not have avoided the accident based on the speed that her vehicle was traveling and how close her vehicle was to Eladio's truck-tractor when she recognized the danger—that a collision could occur, and (3) Eladio's statements do not controvert her testimony or further explain how much "time or space" she had to take appropriate evasive action.

As we have said, the record contains conflicting evidence of Tiffany's awareness of Eladio's truck-tractor at the intersection. She testified that she had a clear, unimpeded, and unobstructed view of the intersection and that "nothing was preventing her" from perceiving Eladio's truck-tractor approaching or stopping at the intersection before the accident occurred. Although she had a clear line of sight of the intersection, Tiffany testified that: (1) she did not see Eladio's truck-tractor pass the stop sign at the intersection before the collision; (2) she noticed that "half" of the truck-tractor had passed the stop sign when she first saw it; (3) she "knew" before the collision that Eladio's truck-tractor had stopped at the intersection, and that she "expected" him to stop as she approached the intersection; (4) she did not see Eladio's truck-tractor as she approached the intersection, and that was "pretty close" to when she first saw the truck-tractor "coming" and she "swerved" to avoid a collision; (5) her vehicle was traveling at a speed of seventy-five miles per hour before the collision, and that she first applied her vehicle's brakes when she reached the intersection, which "probably" reduced her speed before impact; and (6) she did

24

not "put a full amount of force on the brakes"; rather, she "stepped on [the brakes] like a normal person would."

Tiffany also made various inconsistent statements concerning the time or distance that elapsed between her passing the vehicle in the left, southbound lane on U.S. Highway 87 before the collision and when the accident occurred. She initially stated that she did not know how much time had elapsed or the distance that her vehicle had traveled from the point when she had passed that vehicle. However, at trial Tiffany admitted that she had previously stated she had "maintain[ed] [the] outside lane . . . for a couple of miles before the accident happened," and that she did not pass any vehicles before the accident occurred.

Thus, evidence that Tiffany was driving in the right southbound lane with nothing to obstruct her view for a significant distance (approximately two miles) before her vehicle reached the intersection, and that she "knew" before the collision that Eladio's truck-tractor had stopped at the intersection—in combination with evidence of her cell phone usage—constitutes legally and factually sufficient evidence that Tiffany's negligent conduct was a proximate or contributing cause of the accident and her resulting injuries. *See Morriss*, 348 S.W.2d at 792–93; *see also Whitehead v. Tobias*, 7 S.W.3d 658, 663 (Tex. App.—Texarkana 1999, no pet.) (finding that the testimony of a motorist who recognized another vehicle's failure to yield-the-right-of-way approximately 200 yards before merging was a fact issue for the jury to determine as to whether the motorist's action could have prevented the accident from occurring); *Golleher v. Herrera*, 651 S.W.2d 329, 333 (Tex. App.—Amarillo 1983, no writ) (holding that the failure to see an automobile approaching tends to establish the absence of a proper lookout).

In this case, as in all cases, the jury is the sole judge of the credibility of the witnesses and may reconcile any inconsistencies in the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Tiffany's credibility

25

and the weight to be afforded her testimony were matters for the jury to determine and we may not substitute our judgment for theirs. *See City of Keller*, 168 S.W.3d at 807, 822, 827. Here, while there is some evidence from which the jury may have inferred that Eladio's negligence was the sole or primary cause of the accident and Tiffany's resulting injuries, the jury was presented with conflicting evidence concerning which party's negligence caused or contributed to cause, in any way, the injuries and harm for which Tiffany sought a damage recovery in this case. When, as in this case, disputed evidence exists on the issues to be decided, the jury's findings should not be disturbed. *Id.*; *see Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 892–95 (Tex. App.—Texarkana 2004, pet. denied).

We conclude that the evidence before us supports the jury's negligence and proportionate responsibility findings, and that this evidence was not so weak or against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Pool*, 715 S.W.2d at 635; *Arcides v. Rojas*, 677 S.W.3d 154, 163–64 (Tex. App.—El Paso 2023, no pet.).

Accordingly, we overrule Tiffany's first issue.

### IV. *This Court's Ruling*

We affirm the judgment of the trial court.

W. STACY TROTTER
JUSTICE

June 26, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.